Lanna L. LEE, f/k/a Lanna Pai, and B. Lanna, Inc., Appellants,

v.

Theodore HASSON, H. International Distribution, Inc. a/k/a Hasson International Distribution, Inc., and Diversified Financial Enterprises, Appellees.

No. 14–05–00004–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 30, 2007.

**6**

David M. Gunn, Constance H. Pfeiffer, Russell S. Post, Warren Cole, Murray Fogler, Houston, for appellants.

Kevin Dubose, Roger D. Townsend, James R. Moriarty, Patrick Kevin Leyendecker, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and GUZMAN.

**OPINION**

EVA M. GUZMAN, Justice.

This appeal arises from a dispute over the existence and enforceability of an oral contract between an insurance broker/financial advisor and his wealthy friend and client, who retained his services as an advisor regarding the division of property incident to her divorce. The outcome of the appeal turns on the existence and fulfillment of any informal fiduciary duty owed by the advisor to the client. The client, appellant Lanna Lee (formerly Lanna Pai) and her company, appellant B. Lanna, Inc., challenge the judgment entered in favor of the advisor, appellee Theodore Hasson ("Hasson") and his companies, appellees H. International Distribution, Inc. a/k/a Hasson International Distribution, Inc. and Diversified Financial Enterprises. Appellants argue, *inter alia*, that the trial court erred by granting appellees' motion to disregard the jury finding that a relationship of trust and confidence existed between Lee and Hasson and contend that this ruling constitutes harmful error because there is no evidence that Hasson complied with the fiduciary duty arising from that relationship. Therefore, appellants argue, Hasson failed to overcome the presumption that the agreement, if any, is void. We agree, and accordingly, we reverse and render judgment that appellees take nothing.

### I. FACTUAL AND PROCEDURAL HISTORY

#### A. The Hasson and Pai History Before the Oral Agreement[1]

Lou Pai married Lanna Lee in 1976. They had a son, B.P., in September, 1979, and a daughter, S.P., born in 1982. Pai has advanced degrees in economics and at the time of these events, he was an executive in various Enron companies; Lee was a college-educated homemaker. Through their children, the Pais met Theodore and Terry Hasson in 1993. Ted Hasson was a life insurance agent and securities dealer. The Hassons and the Pais became good friends and spent many vacations and holidays together. In 1995, Hasson sold the Pais a $5 million second-to-die life insurance policy and learned their personal medical information and some of their financial information. The Pais applied for a $6 million policy in June 1995, a $15

---

1. The jury found that Lee and Hasson had an oral agreement, and in reviewing the evidence on the legal sufficiency issues in this appeal— i.e., whether a reasonable jury could have found that Hasson and Lee had a preexisting confidential relationship and Hasson fulfilled his fiduciary duty to Lee—we assume that jurors decided questions of credibility or con-

flicting evidence in favor of the verdict if they reasonably could do so. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819, 820 (Tex.2005). Accordingly, our recitation of the facts credits favorable evidence if reasonable jurors could, and disregards contrary evidence unless reasonable jurors could not. *See id.* at 827.

million policy in November 1996, and a $50 million policy in March 1998.

In January 1998, Lee discovered that Pai had been having an extra-marital affair and had another child outside of their marriage. She confided her discoveries to the Hassons. Pai moved out of the family home in 1999, and Lee interviewed various family law attorneys, including Lawrence Rothenberg. Lee's sister, who is also an attorney, accompanied Lee to some of these interviews. On June 15, 1999, attorney J.D. Bucky Allshouse filed a petition for divorce on Lee's behalf; however, Lee withdrew the suit ten days later.

On or about August 26, 1999, Lee sought Hasson's advice. Anticipating a divorce, Lee asked Hasson what actions she should take while she was still married. At Hasson's request, Lee forwarded financial statements from Pai's bank to Hasson. According to Hasson, he was "shocked" by the financial statements. Hasson discovered that the Pais' net worth was approximately two and half times the amount Hasson had believed it to be and that a large portion of their assets consisted of Enron stock and options. Hasson spoke with Lee about diversification, and at Hasson's suggestion, Lee began the application process for a variable life insurance policy in the amount of $12 million. Within a few months, the amount of this policy was doubled to $25 million. Hasson also advised Lee to pressure Pai to exercise Enron stock options or sell stock, and Lee asked Pai to do so.

## B. The Original Agreement

The parties do not dispute that Pai wanted to negotiate his divorce from Lee without attorney involvement. It is also undisputed that Lee turned to Hasson for advice in negotiating the divorce. As Lee testified:

Lou never wanted lawyers involved and, you know, when Ted and I would talk, Ted would also say, Lanna, you don't really need a—lawyers to work out—to get a favorable settlement. So, you know, it wasn't only Lou.

. . .

Lou did say that, too, but you know, as—the reason we're here, you know, Ted was a friend and Ted and I were talking a lot. We had lots of discussions and he was saying, you know, Ted was helping me and, you know, Ted was also saying, you know, Lanna, we don't—you know, I can help you brainstorm about possible marital settlement ideas and you really don't, you know, you don't really need a lawyer to work out a favorable settlement.

Hasson contends that in September 1999, Lee offered to hire him to work for her full-time. According to Hasson,

Basically the agreement I had with her at that time was to agree to agree, so to speak. In other words, this—this was like new territory, so we both needed to kind of get a grip with what was going to need to be done, the things she was going to be asking me to do, the amount of time that she was going to be asking me to—to take. So—it seemed to me and to Lanna that what made the most sense was to just kind of start feeling our way through this, and that's what we did starting—starting really in October [1999]. So October, November, December, we got a pretty good flavor for what this thing was going to take.

The nature of Hasson's services is imprecisely defined in the record, and the jury charge did not require the jury to identify the services that Hasson was required to render, or over what period of time. According to Hasson's live pleadings at the time of trial,

[Hasson agreed] to essentially do whatever [Lee] asked Hasson to do and to wear whatever "hat" [Lee] asked Hasson to wear in achieving the ultimate goal which was the best property division and settlement possible as quickly as possible with the minimum adverse impact on [Lee] and her children. [Lee] and Hasson agreed that Hasson would assist [Lee] in developing options and alternatives, considering the impact of any decision or course of action on [Lee]'s quality of life and [Lee]'s children, keeping focused on the various issues and decisions which would have to be made on a short, medium and long-term basis, considering the consequences of pursuing an option, alternative or decision, the impact on Lou Pai and his potential reaction, as well as considering [Lee]'s exposure to market risk related to the Enron stock and stock options which were a major asset in the community estate.

Hasson described his negotiations with Lee as follows:

Q: What did you understand she was talking about hiring you to do?

A: At that time [September 1999]? Well, I think the only thing we talked about was, hey, listen, I've fought this situation. Oh, yes, I remember this. She said, listen, I'm getting ready to negotiate with the toughest negotiator at the Enron Corporation. It's going to be the biggest deal of my life, and I'm going to need some help with that. I remember that.

Hasson's lawyer also asked him why Lee hired Hasson rather than a licensed family law attorney. Hasson testified:

Q: All right. Well, here's what I'm a little curious about. And I'm sure the jury is curious about this. Why didn't she just go out and hire the best divorce lawyer in Texas?

A: You know what? On that day—at that point in time on that day I actually—I didn't—I didn't know about that, and I don't think that was anything—I know that—that wasn't something that was discussed on that day.

Q: Was there a time when she did explain to you why she wasn't out hiring a first-class divorce lawyer?

A: Absolutely. She—she just said, hey, listen, Lou wants to do this thing without lawyers, and I'm—me, too. I don't really want to do it without lawyers, and so—I mean, it couldn't have been—it was just real simple.

## C. Hasson's Work for Lee

Hasson contends he began working for Lee in October 1999 and reached an oral agreement with her regarding his compensation on January 18, 2000. According to Hasson, he presented three different compensation schemes to Lee, and she selected the option in which she agreed to place her entire share of the marital estate into a limited partnership with Hasson, give him 10% of the partnership, and pay him an annual salary equal to 1% of the share of the marital estate she received in the divorce. Hasson further testified that Lee agreed to build a multimillion dollar home (the "Dunsinane House") for the Hassons and lease it to the Hassons for an annual rent equal to 10% of the home's value, deducting the rent from Hasson's salary.

During his first month of employment, Hasson helped Lee obtain a mortgage loan and line of credit; however, as Hasson conceded at trial, Pai already had arranged such financing before Hasson's involvement. At trial, Hasson testified that he did not know whether the terms of the loan he arranged were better or worse

than the terms of the loan arranged by Pai; however, the loan arranged by Hasson included a payment of $120,000 to Hasson's company, Diversified Financial Enterprises. Lee also gave Hasson a check for $100,000 for earnest money for a house she considered buying.[2] According to Lee, "It was Ted's idea. He told me I should buy a house." However, the contract for the property identifies Theodore and Theresa Hasson as the buyers. Lee testified she later learned that Hasson put the earnest money check in his bank account and told her the contract fell through. According to Hasson, however, both this check and the $120,000 payment to Diversified Financial Enterprises were advances against the amounts he would be due under his oral agreement with Lee.

At some point, Lee also expressed concern to Hasson that she might be sued for the actions of her son.[3] Lee's son was over eighteen years old at this time, and Hasson "did have that idea" that B.P.'s judgment creditors, if any, could not recover against Lee. However, partly in response to these concerns, and partly for unspecified tax reasons, Hasson arranged for the formation of a corporation, B. Lanna, Inc., on February 11, 2000. The company was intended to be part of an asset protection mechanism. There is some evidence that Hasson owned 10% of the company. Hasson's accountant, Raleigh Bailes, served as the company's chief financial officer.

As anticipated, Lou Pai filed for divorce on March 3, 2000 in the 245th District Court of Harris County, Judge Annette Galik presiding. Pai and Lee mediated their divorce in April and May 2000. According to Hasson's wife, Lee "wasn't always happy with that decision [to negotiate the divorce without attorneys]. She wanted to go to court and kind of—you know, I guess she felt that that would be a way to kind of bring things out in the open. And so Ted would kind of tell her that probably it wasn't in her best interest if Lou was going to do what was right." Nevertheless, at Lee's invitation, Hasson accompanied her to interview divorce attorney Donn Fullenweider. Hasson suggested that attorney Lawrence Rothenberg review Fullenweider's proposed contract. According to Hasson, he advised Lee not to retain Fullenweider based on Rothenberg's advice.

Lee discussed the offers and counteroffers of the divorce mediation with Hasson, including specific figures and percentages of the proposed marital property division. Hasson also advised Lee regarding negotiating tactics and strategies. Although Hasson did not attend any of the mediation sessions, Victor Harris, Lee's accountant, accompanied her. Hasson and Lee did not disclose the existence of their oral agreement to Harris. According to Hasson, he was honoring Lee's request that no one know about her contract with him.

## D. The Modification and Termination of the Agreement

Hasson claims that on May 3, 2000, Lee told him that she wanted to modify her

---

2. The check was payable to H.I.D., Inc.

3. Pai testified that his son has a bipolar disorder. According to Hasson, "At one point in time, [B.P.] was in a car accident in Florida. And I think the person driving the car that he was in was killed. [Lee] told me that it was well documented, [B.P.]'s challenges were well documented and that they had bought him a brand new BMW and that she felt like if he were to hurt somebody that she—that they—now that she had—had some money, or when she got some money—I guess this was actually before she got money when she was talking, told me about this. She said that she was worried that it would be easy to prove that she and Lou knew about [B.P.]'s challenges and that maybe somehow they'd be—they could be sued and held liable because they gave him the keys to the car."

oral agreement with him to eliminate the contemplated partnership and instead pay Hasson 10% of the value of her marital estate at the time of her divorce in exchange for services he had rendered in the past and was expected to render in the future. According to Hasson, he also agreed to work for the remainder of the year to finish pending projects for which he would be paid a salary equal to 1% of Lee's share of the marital estate. Hasson further testified that the Dunsinane House was no longer part of his compensation package after May 3, 2000. Nevertheless, he continued to work with various contractors on the house and continued using Lee's money to do so. On May 4, 2000, Hasson signed a contract for the addition of a pool to the Dunsinane House at a cost of approximately $86,000. He signed the contract "P.O.A. for L. Pai."[4] No evidence was presented at trial that Hasson had a valid power of attorney at that time.

At some point, Lee and Pai verbally agreed to begin separating their assets and treating the assets under each spouse's control as his or her own. Pai exercised options and sold large quantities of Enron stock during the first five months of 2000. Although Lee still maintained a joint account with Pai, she opened additional accounts to which Hasson was added as a signatory. Pai transferred funds allocated to Lee to one or more of Lee's accounts.

On May 19, 2000, Hasson, Lee, and accountant Raleight Bailes held a meeting to prepare for the final divorce mediation scheduled to take place a few days later. Bailes described the meeting as follows:

> We discussed whether or not [Lee] should withdraw the money from the joint account [with Pai] and put it into her account. I suggested that she call her attorney Donn Fullenwilder [sic], to get his input. Ted said that wasn't a good idea because Donn was going to charge her $7,000,000 to get her 50% of the community estate.[5] Recognizing that [Lee] was going to get this money sooner or later, it was agreed that she would not invade the [joint account] unless the settlement negotiations broke down.

The conversation then addressed the necessity or desirability of immediately withdrawing funds from Lee's accounts for particular purposes. The versions of this conversation given by Bailes, Lee, and Hasson differ. According to Bailes, he informed Lee and Hasson that:

> to the extent that [Lee] was paying valid business, investment or personal expenses, she might have a shot at having that come out of the community assets. [Lee] then detailed the expenses that were going to be paid and mentioned she owed [Hasson] some money for his services. I jokingly asked how much, $10,000? After laughing, [Lee] outlined to me her deal with [Hasson]: [Hasson] will get a fee equal to 10% of the fair market value of what she recovers in the divorce settlement with [Pai]. Since she has already recovered $40,000,000, she owes him $4,000,000 currently, and will owe him 10% of whatever assets she receives in the future as a result of the divorce. To maximize the potential tax deduction to [Lee], I suggested all these expenses be paid by B. Lanna, Inc. and.... I recommended [Hasson's] fee be paid to his corporation.

According to Lee, Hasson told her that Judge Galik was likely to freeze the assets in the marital estate, and Hasson and Lee

---

4. Lee was still using the name Lanna Pai at that time.

5. *See* section III(B)(1)(a), *infra.*

discussed the need to withdraw funds from Lee's accounts before that occurred in order to pay for current expenses. Lee testified that she subsequently transferred $4 million to Hasson's company with the intent that he hold the money for her. In his testimony, Bailes agreed that Lee and Hasson discussed whether Lee should withdraw funds and have Hasson hold the funds for her, but according to Bailes, he advised Lee not to do so, but to pay Hasson only if she owed him money. Hasson also testified that he and Lee discussed whether Judge Galik would freeze the assets in the marital estate, but according to Hasson, Lee introduced the subject.

In any event, on May 23, 2000, Hasson transferred $5.95 million from Lee's account to B. Lanna, Inc. The corporation then issued a cashier's check for $4 million to H. International Distribution, Inc., the company through which Hasson and his wife sell Amway products.

Bailes testified that a few days later, Lee contacted him in an effort to reach Hasson, and Bailes told Lee that Hasson was on vacation. Lee and her daughter then joined the Hassons on vacation in early June. According to Lee, she asked Hasson to return the $4 million. Lee returned from the vacation a week or so before Hasson.

When Hasson returned, Lee arranged to meet with him on June 29, 2000. According to Hasson, Lee told him at the meeting that she would not pay him 10% of her share of the marital estate and asked him to accompany her to the office of attorney Warren Cole. Hasson refused to do so, and Lee left. Later that day, Cole sent Hasson a letter by messenger informing Hasson that all business relationships between Lee and Hasson were terminated and all powers of attorney revoked. Cole's letter further advised Hasson that "any possessory interest you may have thought you would have had in the [Dunsinane House] is hereby revoked and terminated." Cole also requested that Hasson return the $4 million previously transferred and resign from B. Lanna, Inc. by July 14, 2000.

### E. The Divorce

Pai and Lee were divorced on August 21, 2000. Under the terms of the Agreement Incident to Divorce ("AID"), Pai and Lee agreed that the marital estate, exclusive of certain securities discussed below, was worth $193,620,145. Lee received over 57% of the assets of the marital estate, and her share of the estate had a total agreed value of $110,536,269, excluding restricted or unissued securities.

Pai and Lee also agreed that Lee would receive one-half of the equity Pai was entitled to receive in The New Power Company. Specifically, under his employment agreement with an Enron affiliate, Pai was entitled to receive 2% of the equity in The New Power Company for an amount that totaled 2,064,400 shares; however, the stock had not yet been issued at the time of the divorce. Pai received the shares in October 2000 subject to transfer restrictions, and the value of Lee's portion of the stock under the AID was disputed at trial. The AID did not place a value on the unissued securities, but merely allotted half of the equity to Lee and half to Pai. In assigning values to the other assets of the marital estate, Lee and Pai agreed that each cash account had a value equal to its balance on May 24, 2000, and publicly traded securities were assigned their value as of July 24, 2000. The AID did not identify a method for determining the value of stock that had not yet been issued.

### F. Hasson's Suit

Hasson sued Lee on July 10, 2000, alleging that Lee's share of the marital estate,

including the New Power shares, totaled approximately $140 million, and that Lee owed him 10% of this amount in payment for his services under the terms of the May 3, 2000 modification of their oral agreement.[6] At trial, Lee denied that she had an agreement with Hasson, and contended that he was instead a helpful friend. In the alternative, she argued that the agreement described by Hasson is unenforceable. Lee also countersued for recovery of funds Hasson and his companies received from Lee, alleging that Hasson converted Lee's funds, committed fraud, or breached his duty as a bailee.

The jury found that Lee agreed to pay Hasson a fixed percentage of the value of her share of the marital estate at the time of her divorce in exchange for Hasson's agreement to provide services. The jury also found that Lee had failed to comply with the agreement, and that her failure was not excused on the grounds that (a) Hasson's services constituted the unauthorized practice of law, (b) the agreement was unconscionable, or (c) Hasson was equitably estopped from enforcing the agreement. The jury further found that Lee owed Hasson $10 million, and that the reasonable fees for the necessary services of Hasson's attorneys totaled $4 million. In response to Question 16 of the charge, the jury found that a relationship of trust and confidence existed between Lee and Hasson at the time they entered into the oral agreement. The jury also answered Question 17 affirmatively, finding that Hasson had complied with his fiduciary duty to Lee. The jury failed to find that Hasson or his companies had converted funds belonging to Lee or that Hasson had committed fraud.

Hasson, Lee, and their respective companies filed cross-motions asking the trial court to disregard particular jury findings. Lee and B. Lanna, Inc. asked the trial court, among other things, to disregard the jury's finding that Hasson complied with his fiduciary duty to Lee, as found in response to Question 17 of the jury charge. Conversely, Hasson and his companies asked the trial court to disregard the finding that Hasson and Lee shared a confidential relationship, as determined by the jury's answer to Question 16. The trial court entered a final judgment disregarding the jury's answer to Question 16 as requested by appellees.

## II. ISSUES PRESENTED

Lee presents six issues for appellate review, and Hasson presents a single cross-point. In her first issue, Lee argues that, because the evidence that Hasson complied with his fiduciary duty to Lee is legally insufficient, the trial court committed harmful error in disregarding the jury's finding that Hasson had a relationship of trust and confidence with Lee. In her second and third issues, Lee argues that the contract between Hasson and Lee is unenforceable because it is unconscionable and violates public policy. In her fourth issue, Lee challenges the factual sufficiency of the evidence supporting the jury's finding that Hasson sustained actual damages in the amount of $10 million. Lee argues in her fifth issue that the jury's finding that Lee and Hasson agreed that Lee would pay Hasson a fixed percentage of the value of her share of the Pai marital estate in exchange for Hasson's services is corrupted by a "tilting" or "nudging" instruction that an agreement "need not be in writing" to be "enforceable." Lastly,

---

6. At trial, Hasson testified that Lee owed him 10% of her marital state, plus an additional 1% of Lee's share of the estate as salary. During closing arguments, however, Hasson's attorney did not urge the jury to award the additional 1% salary.

Lee asks the court to modify the judgment to delete any recovery by Hasson's companies against Lee's corporation.[7]

In a cross-point, Hasson challenges the factual sufficiency of the evidence supporting the jury's finding that Lee had a relationship of trust and confidence with Hasson.[8]

## III. ANALYSIS

### A. Relationship of Trust and Confidence

In Lee's first issue, she contends that the trial court committed harmful error in disregarding the jury's finding that Hasson had a relationship of trust and confidence with her. Hasson's cross-point, in which he argues that the evidence is factually insufficient to support the jury's finding that Lee and Hasson had a relationship of trust and confidence, relates to the same jury question. This issue is important to both parties because the existence of such a relationship not only imposes on Hasson the elevated duty of a fiduciary, but also places the burden on him to prove that he complied with that duty. *See Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (Tex.1942) (holding that one who occupies a fiduciary relationship to another must measure his conduct by high equitable standards and not by the standards required in arm's-length transactions); *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex.

App.-Austin 1988, no writ) (holding that transactions between a fiduciary and his principal are presumptively void).

### 1. Standard of Review

 A trial court may disregard a jury's verdict and render a judgment notwithstanding the verdict if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003). To determine whether the trial court erred in rendering a judgment notwithstanding the verdict, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). In the course of our review, we assume that jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id.* at 819, 820.

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. If the evidence "would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id.* at 822. We do not substitute our judgment for that of the trier-of-fact if the evidence falls within this zone of reasonable disagreement. *Id.*

---

7. Appellant B. Lanna, Inc. and appellees H. International Distribution, Inc. a/k/a Hasson International Distribution, Inc. and Diversified Financial Enterprises are not alleged to be parties to the contract between Lee and Hasson; however, the judgment held B. Lanna, Inc. jointly liable on the contract, and allowed Hasson's companies to share jointly in the recovery. Although appellants challenge this aspect of the judgment, we do not reach this issue.

8. *See* TEX.R. CIV P. 324(c) ("When judgment is rendered non obstante veredicto or notwithstanding the findings of a jury on one or more questions, the appellee may bring forward by cross-point . . . any ground which would have vitiated the verdict . . . including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact. . . .").

Hasson's challenge to the factual sufficiency of the evidence is subject to a different standard of review. When reviewing a jury finding for factual sufficiency, we consider and weigh all of the evidence and conclude that the finding is not supported by factually sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

### 2. Governing Law

The term "fiduciary" refers to a person owing a duty of integrity and fidelity, and "it applies to any person who occupies a position of peculiar confidence towards another." *Kinzbach Tool Co.*, 138 Tex. at 571, 160 S.W.2d at 512. In certain formal relationships, such as an attorney-client or trustee relationship, a fiduciary duty arises as a matter of law. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex.2002). Texas courts also have recognized that certain informal relationships may give rise to a fiduciary duty. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex.1992). An informal fiduciary relationship exists "where, because of family relationship or otherwise, [one party] is in fact accustomed to be guided by the judgment or advice" of the other. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962). "Such informal fiduciary relationships have also been termed 'confidential relationships' and may arise 'where one person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one.'" *Crim Truck & Tractor Co.*, 823 S.W.2d at 594 (quoting *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 261 (1951)). Stated another way, a party fails to comply with his fiduciary duty "where influence has been acquired and abused, and confidence has been reposed

and betrayed." *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, pet. denied) (citing *Crim Truck & Tractor Co.*, 823 S.W.2d at 594).

"In order to give full force to contracts, we do not create such a relationship lightly." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex.1997). As we have previously stated,

> A person is justified in placing confidence in the belief that another party will act in his or her best interest only where he or she is accustomed to being guided by the judgment or advice of the other party, and there exists a long association in a business relationship, as well as personal friendship.

*Hoggett*, 971 S.W.2d at 488. "The existence of the fiduciary relationship is to be determined from the actualities of the relationship between the persons involved." *Thigpen*, 363 S.W.2d at 253. Where the evidence is disputed, the existence of an informal, confidential relationship is a question of fact. *See Crim Truck & Tractor Co.*, 823 S.W.2d at 594. If a business transaction is involved, the confidential relationship must exist prior to, and apart from, the agreement made the basis of the suit. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex.1998). However, evidence of a party's subjective feelings is insufficient, without more, to establish the existence of a confidential relationship. *Thigpen*, 363 S.W.2d at 253.

### 3. Evidence of a Confidential Relationship

Mere subjective trust does not transform an arm's-length transaction into a fiduciary relationship. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998). Rather, in order to establish the existence of an informal fiduciary relationship, the record must show that one of the

parties relied on the other "for moral, financial, or personal support or guidance." *Trostle v. Trostle*, 77 S.W.3d 908, 915 (Tex.App.-Amarillo 2002, no pet.). The length of the relationship is another important factor in determining whether a fiduciary relationship should be recognized. *Chien*, 759 S.W.2d at 494 n. 6 (citing *Harris v. Sentry Title Co., Inc.*, 715 F.2d 941 (5th Cir.1983)); *Kalb v. Norsworthy*, 428 S.W.2d 701, 705 (Tex.Civ.App.-Houston [1st Dist.] 1968, no writ) (finding a fiduciary relationship where, "By reason of appellant's long association with appellee in a business relationship, as well as the close personal friendship existing between them, appellant was justified in placing confidence in the belief that appellee would act in his best interest."). But even a longstanding relationship of friendship or cordiality is insufficient, without more, to establish an informal fiduciary relationship. *See Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex.2005) (holding that no fiduciary relationship existed where the record showed that, although the parties were friends and frequent dining partners, their prior projects together were arm's-length transactions governed by agreements that expressly disavowed the creation of any fiduciary duty); *Atrium Boutique v. Dallas Mkt. Ctr. Co.*, 696 S.W.2d 197, 199–200 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (holding that the trial court properly disregarded a jury finding that appellant Bayoud shared a confidential relationship with appellee Crow where the record reflected only that their families had been socially acquainted for twenty-two years and shared a "friendly, respectful relationship," but that Bayoud was never guided by Crow). On the other hand, a close personal family relationship can give rise to a fiduciary relationship. *Holland v. Lesesne*, 350 S.W.2d 859, 862 (Tex.Civ. App.-San Antonio 1961, writ ref'd n.r.e.) (affirming finding of a confidential relationship where the evidence showed an "unusually close personal friendly and confidential relationship" between the parties and their families in which the families visited each other regularly, dined together, and vacationed together).

██ The record reveals both legally and factually sufficient evidence that Hasson and Lee shared a long-standing business relationship and a close personal family relationship well beyond casual friendship and that Lee relied on Hasson for moral, financial, and personal guidance or support. Moreover, their relationship began in 1993 and therefore predated their agreements by approximately six years.

Although the friendship between the two families dates back to 1993, the business relationship between Hasson and the Pais began in 1995, when Hasson sold the couple a $6 million life insurance policy. The following year, the couple purchased a second, $15 million policy from Hasson. When the Pais purchased a $50 million policy in 1998, Hasson became the top producing life insurance agent for that insurer in the country, due primarily to the fact that this was the largest life insurance policy written. The extent to which Hasson relied on business from Pai and Lee is evidenced in his own testimony, in which he describes his reaction upon learning of Pai's affair:

> I remember sort of disengaging a little bit from that news. This was not good news, as you've heard, about the family relationships and, of course, at this point in time I had also started a business relationship with Lou and Lanna, *so this was not good news for the Hasson family or for my business with them.*

(emphasis added). Before beginning work for Lee in October 1999, Hasson helped Lee apply for yet another life insurance

policy in August 1999. Hasson earned commissions on each of these sales.

The evidence is also uncontroverted that the families were unusually close. For example, the Hassons and the Pais vacationed together at Lake Powell, the Cayman Islands, and the Pais' ranches in Texas and Colorado. Not only did the two families vacation together, as in *Holland,* but as Hasson admitted, "these two families had practically lived together."

In addition, Lee depended on Hasson for personal and moral support, as evidenced by testimony that Hasson's attorney elicited from both Hasson and Lee:

Q: Was there anybody in the world who had the relationship with Lanna Pai that would allow them to fulfill the role that you fulfilled for her besides you?

Hasson: I can't imagine that there was anyone that cared and had the abilities that she knew I had and the knowledge she knew I had about all the items, all the topics that were important to her in her life.

. . .

Q: And in this darkest hour of your life did you turn to Ted Hasson?

Lee: Yes. Yes, I did. I did turn to Ted Hasson.

Q: He was a rock for you, wasn't he, [a] stabilizing influence?

Lee: I was very vulnerable. I needed— I looked for some support and Ted was there.... He stepped in and he was there for me.

. . .

Q: And in this darkest hour is it fair to say that—that you leaned on Ted?

Lee: Yes. That's correct. I did lean on him.

Q: You and he through the course of all that we're fixing to talk about became very close friends, didn't you?

Lee: Yes.

Q: Much closer than you were before when it was just the families and the vacations and the ranch and the Grand Cayman and all that. That really was the—where you and Terry [Hasson] became close, but you and Ted really didn't become close until you turned to him, is it fair to say, in your darkest hour, from that point forward is where the closeness developed?

Lee: Yes, especially after Lou moved out. I turned to Ted and Ted was there and I—I confided in him. I trusted him.

Hasson's attorney also elicited testimony establishing that Lee's reliance on Hasson's support predated any agreement between them:

Q: During this period [the summer of 1999] where you were still trying— you were hopeful that the marriage might get reconciled[,] there were things that you and Ted were doing together, he was doing with you to—I don't know if this is the right way to describe it, but get your self esteem back where you knew it needed to be, where it could be and where it should be, things of that nature?

Lee: I don't know if I'd call it self esteem. Ted was a friend. I looked to him. I trusted him to give me a lot of moral support. As we've said earlier, you know, it was the worse—it was the worse [sic] time of my life and I was having problems with my children and—and during our marriage Lou always made all of the big decisions, and so when Lou left I'm all alone and I've got my daughter threatening suicide, I've got my son in depression,

too, so I turned to Ted and Ted was there for me.

Q: The Be All Lanna Can Be program, you heard that before, haven't you?

Lee: Yes, sir.

Q: What does that mean to you?

Lee: It means that something—that's something Ted would say to me. Ted—as I said, Ted was giving me a lot of support. He was there to give me emotional support and moral support and he would, you know, try to make me feel better and punch me up and say, listen, Lanna, you know, you—you know, you are—you can be strong. You can be—I want you to be everything you can be and that's where be all you can be, sounds a little corny out of context, but that's sort of—sort of like a cheer, you know, be all you can be, and, you know, he knew—he saw what—how difficult it was for me, you know, with this divorce . . . .

Q: This Be All Lanna Can Be program, pumping you up, encouraging you, whatever is the best way to describe that, that was going on when you and he were trying to figure out ways to reconcile your marriage. Right?

Lee: Yes. Yes.

Q: This way before any, let's go find bankers and realtors and accountants and all that. This is a time period earlier in time. Right?

Lee: You know, I believe it was. I'm just saying, you know, once I confided in Ted that I'm having marital problems, which was around—I discovered in January of '98 and I told Ted I was having marital problems in February of '98 . . . .

These are not isolated examples of testimony illustrating a preexisting relationship of trust and confidence; for example, Lee's daughter also stated that Hasson had "al-ways been the father figure I looked to for support" and described the Hassons as family. Hasson's wife, whom Hasson described as Lee's "best friend," testified as follows:

Q: Mrs. Hasson, given the closeness of the two families that you've described for us, there was a relationship of trust and confidence that existed between Mr. Hasson and Mrs. Pai, or now Ms. Lee, even before he started working for her, wasn't there?

A: Trust?

Q: A relationship of trust and confidence.

A: Yes. Yes. I would say so.

Lee's trust in Hasson was reciprocated; Hasson testified that he trusted Lee "100 percent" and suggested that few people knew him as well as Lee did. Moreover, establishing the pre-existence of a relationship of trust was an explicit part of Hasson's trial strategy, as illustrated by his attorney's opening statement:

He takes them on vacations. They go out to Lake Havisaw and they go jet skiing and they go—they spend their vacations together, they spend Easters and Thanksgivings together, and the families bond as families do . . . . Now, who are you going to turn to if you find out the person you love the most in life, that you've been married to for 20 some odd years, has been dating somebody for years? You turn to people you trust and that you know and that you care about. And the Hassons did what people who are decent and honest and have integrity do. They stand by their friends . . . . It's a hundred to a thousand. That's what we claim this man right there, Ted Hasson, was more loyal to that woman right there, Lanna [Lee], than her own husband. You can argue

about whether he was a hundred times more loyal or a thousand times more loyal, but he was more loyal. . . .

Hasson argues that the evidence at trial showed only that Lee had subjective feelings of trust for him and that her feelings are insufficient to establish an informal fiduciary relationship. *See Ins. Co. of N. Am.,* 981 S.W.2d at 674 (holding that subjective trust, without more, is insufficient to transform an arm's-length transaction into a fiduciary relationship). However, the record contains repeated examples of objective manifestations of Lee's confidence in and reliance on Hasson. In addition to the "Be All Lanna Can Be" program described above, Lee also shared confidential medical and significant financial information with Hasson, and as Hasson testified, relied on him for financial guidance. For example, Hasson testified that on August 26, 1999—before Lee made any offer of employment—Lee asked Hasson if there were any actions she should take while she remained married. Hasson asked for financial information, and, at Hasson's request, Lee supplied him with more information than Pai ever had shared with Hasson before. On Hasson's advice, Lee began the process of applying for more life insurance. According to Hasson, he also began to teach Lee about diversifying her assets at this time. Eliciting evidence that Lee shared confidential information with Hasson also formed a part of Hasson's trial strategy, as demonstrated in his attorney's closing argument:

> She shared confidential information. If I heard it once, I heard it a number of times. I'm a private person. I don't want my business out in the public airing, but yet we know time and time again she shared her personal confidential financial information with Ted Hasson. We also know she never shared that with any other friend she described, save perhaps for her sister.

Finally, Lee relied on Hasson for personal guidance and support in areas as important to her as achieving reconciliation in her marriage. For example, it is undisputed that Lee initially did not want a divorce. She instead relied on Hasson's advice in joining with him to purchase a boat for Pai in the hope that the gift would help to effect a reconciliation:

> Lee: I believe it was about a 30 foot boat. I was having, of course, terrible marital problems and I didn't want the divorce and Ted came up with the idea and he said, well, Lanna, Lou like[s] boat[s so] why don't you buy him a boat for his birthday? Why don't you surprise him with a boat? And I was thinking, I don't know, that's a lot of money, and we talked about it and then Ted came over to my home and he walks in and says, oh, by the way, I bought a boat. And I said, what, you bought a boat? He said, yes, I [bought] a boat. Remember I said it would be a good idea to get a boat for Lou? And since he had bought it I felt that I should help pay for it . . . . and he said, well, how about you give part of the boat to Lou and Terry [will] give part of the boat to me, meaning Ted, so it would be part Lou's and Ted's boat, so—
>
> Q: All this family doing stuff together—
>
> Lee: Right. And I would just say at this point, you know, I was—I was desperately trying to keep this marriage together and, you know, willing to do just about anything, so when Ted said, listen, let's try the boat, and since he had bought it I was like, okay, Ted, you bought it, but I feel I should give you some money for it. So that's how we ended up getting this boat, a 30 foot—I think it's about

30 feet. I don't know much about boats. . . .

In sum, we conclude the evidence is legally sufficient to allow a jury of reasonable and fair-minded people to find that Lee and Hasson had a relationship of trust and confidence before entering into the agreement at issue. Moreover, because such a finding is not contrary to the overwhelming weight of the evidence, it is also factually sufficient.

We emphasize that fiduciary relationships are not lightly created. *See Schlumberger Tech. Corp.*, 959 S.W.2d at 177. However, the extraordinary facts of this case present a rare example of the type of close personal relationship of trust and confidence that gives rise to a legally cognizable fiduciary duty. *Compare Holland*, 350 S.W.2d at 862 (affirming finding of a confidential relationship between unusually close families who vacationed together), *with Trostle*, 77 S.W.3d at 915 (holding that former stepmother did not owe a fiduciary duty to stepson who stopped speaking to her before his father's death and where stepson did not rely on stepmother "for moral, financial, or personal support or guidance."). We therefore hold that the trial court erred in disregarding the jury's answer to Question 16.

**4. Effect of the Error in Disregarding the Finding of a Confidential Relationship**

Because Hasson and Lee shared a confidential relationship prior to the agreement at issue, Hasson owed Lee the duty of a fiduciary; however, evidence that Hasson complied with his fiduciary duty was minimal at best. This deficiency was noted by the trial court, who observed on the record, although out of the jury's presence, that there was no evidence that Hasson complied with his fiduciary duty to Lee.[9] Nevertheless, the court stated in its final judgment that disregarding the finding of a confidential relationship rendered the jury's finding that Hasson complied with his fiduciary duty immaterial.[10]

"A trial court may disregard a jury's finding if there is no evidence to support the jury's finding or if it is immaterial." *Dunnagan v. Watson*, 204 S.W.3d 30, 39 (Tex.App.-Fort Worth 2006, no pet.). "A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings." *Se. Pipe Line Co., Inc. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999). Here, however, the finding that the parties shared a confidential relationship is both supported by the evidence and material to the question of whether Hasson owed Lee such an elevated duty. Thus, the trial court erred in disregarding this finding.

This error is harmless if a reasonable jury could have found that Hasson complied with his fiduciary duty to Lee. But, if the record does not support the jury's finding that Hasson fulfilled his fiduciary duty, then Hasson failed to overcome the presumption that his agreement with Lee is void, and the trial court's error in disre-

**9.** After the close of evidence, the trial court stated, "There is no evidence to my mind that he met his obligations as a fiduciary. However, seems to me it's hotly in dispute as to whether or not he was, in fact, a fiduciary."

**10.** We grant no deference to the trial court's statement that there is no evidence that Hasson complied with his fiduciary duty to Lee.

*See Martin–Simon v. Womack*, 68 S.W.3d 793, 796 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) ("We review conclusions of law de novo to determine whether they are correct."). Rather, we relate the trial court's observation solely to place the judgment and the arguments of the parties in context.

garding the jury's answer to Question 16 is harmful. *See Chien,* 759 S.W.2d at 495.

■ On appeal, Lee and Hasson repeat the same arguments regarding harm that were made at trial. Hasson argues that the jury's finding that he complied with his fiduciary duty to Lee renders the trial court's alleged error in disregarding the jury's answer to Question 16 immaterial, and thus, harmless. *See City of Browns-ville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) (stating that a jury question is considered immaterial when, *inter alia,* its answer cannot alter the effect of the verdict). In contrast, Lee contends there is no evidence that Hasson complied with his fiduciary duty to her, and thus, the trial court's error is harmful and requires this court to reverse and render judgment. Hence, in order to determine whether the trial court's error is harmful, we must determine whether legally sufficient evidence supports the jury's finding that Hasson complied with his fiduciary duty to Lee.[11]

■ As stated, in conducting a legal-sufficiency review, we examine the entire record, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 827. The Texas Supreme Court has described a number of such circumstances in which a reviewing court must consider evidence contrary to the verdict, i.e., evidence that a reasonable jury could not have ignored. For example, although we must "consider evidence in the light most favor-able to the judgment, and indulge every reasonable inference that would support it [,] ... if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* More particularly, we cannot " 'disregard undisputed evidence that allows of only one logical inference.' " *Id.* at 814 (quoting *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002) (plurality op.)). In addition, "when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* "Undisputed contrary evidence may also become conclusive when a party admits it is true." *Id.* at 815. Moreover, we "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 820. Finally, "[w]hen evidence contrary to a verdict is conclusive, it cannot be disregarded." *Id.* at 817. Again, the final test is whether the evidence would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827. We will uphold the jury's finding if it falls within the zone of reasonable disagreement. *Id.* at 822.

## B. Compliance with Fiduciary Duty

We begin our analysis with the charge as submitted to the jury. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000).

Question 17 reads as follows:

11. Hasson suggests that Lee waived this argument by failing to "list a challenge to the finding of compliance with fiduciary duty in her issues presented." However, Lee has challenged the trial court's ruling disregarding the jury's finding that a confidential relationship existed, and in a subsidiary argument, explicitly argues, "The JNOV error is harmful because there is no evidence—and the trial court agreed on the record that there is no evidence—that Hasson complied with that duty." This argument was sufficiently briefed, and we hold that appellants' statement of the issues, their treatment of subsidiary questions, and their corresponding statement of facts and argument satisfy the requirements of the appellate briefing rules. *See* TEX R.APP. P. 38.1(e)-(h).

Did Ted Hasson comply with his fiduciary duty to Lanna Lee?

Because (as you found in response to Question 16) a relationship of trust and confidence existed between them, Ted Hasson owed Lanna Lee a fiduciary duty. To prove he complied with his duty, Ted Hasson must show:

a) the transactions in question were fair to Lanna Lee;

b) Ted Hasson made reasonable use of the confidence that Lanna Lee placed in him;

c) Ted Hasson acted in the utmost good faith and exercised the most scrupulous honesty toward Lanna Lee;

d) Ted Hasson placed the interests of Lanna Lee before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Lanna Lee, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

e) Ted Hasson fully and fairly disclosed all important information to Lanna Lee concerning the transactions.[12]

To find that Hasson complied with his fiduciary duty to Lee, the charge required the jury to find that Hasson proved each of the five specified facts. Appellants argue that there is legally insufficient evidence to show that Hasson proved any of these factors. We therefore examine the record to determine if a reasonable jury could have found that Hasson complied with his fiduciary duty to Lee, in accordance with the factors set forth in the jury

charge. We will address our discussion of the record in a manner that tracks the jury charge; however, because the facts set forth in the record often pertain to more than one of the five factors required for compliance as described in the jury charge, our placement of evidence under the various headings is not intended to indicate that the evidence is related solely to that factor.

### 1. Were the Transactions Fair to Lee?

Texas courts apply a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure. *Fitz–Gerald,* 150 Tex. at 49, 237 S.W.2d at 261. Thus, the profiting fiduciary bears the burden of showing the fairness of the transactions. *Collins v. Smith,* 53 S.W.3d 832, 840 (Tex.App.-Houston [1st Dist.] 2001, no pet.). Such fiduciaries must prove they acted in good faith and that the transactions were fair, honest, and equitable. *Id.* In establishing the fairness of a transaction involving a fiduciary, some of the most important factors are: (1) whether there was full disclosure regarding the transaction, (2) whether the consideration (if any) was adequate, (3) whether the beneficiary had the benefit of independent advice, (4) whether the fiduciary benefitted at the expense of the beneficiary, and (5) whether the fiduciary significantly benefitted from the transaction as viewed in light of circumstances existing at the time of the transaction. *Estate of Townes v. Townes,* 867 S.W.2d 414, 417 (Tex.App.-Houston [14th Dist.] 1993, writ denied).[13]

---

12. This question tracks the Texas pattern jury charge addressing breach of fiduciary duty. *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES. FIDUCIARY DUTY PJC § 104.2 (2003).

13. Because the questions of whether Hasson fully disclosed important facts or benefitted at Lee's expense are issues that the jury was required to find independently from its determination of fairness, these issues are discussed separately below, and we will not

### (a) Was the consideration adequate or excessive?

Because a fiduciary relationship was established, the burden rested on Hasson "to show by evidence that [his payment] constituted a fair and reasonable compensation for the services rendered." *See Kalb*, 428 S.W.2d at 705; *see also Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex.1965) (explaining that courts "scrutinize with jealousy all contracts [with a fiduciary]"). Hasson argues that the agreement was reasonable at the time it was made, referring to the original agreement entered on January 18, 2000, under which Hasson would receive (a) a 10% share in a partnership holding all of Lee's assets from the property division, (b) an annual salary equal to 1% of Lee's share of the marital estate, and (c) a lease on a multi-million dollar home to be constructed at Lee's expense. If we accept Hasson's contention that Lee's share of the marital estate was worth $140 million, then his total compensation for the first year would be $15.4 million. If we also accept his contention that he believed the total marital estate to be worth $75 million at the time of the initial agreement, before the value of Enron stock increased, then his anticipated compensation would have been $4,702,500.[14]

We find no evidence in the record to support Hasson's contention that even the lesser amount constituted fair and reasonable compensation for his services. To the contrary, the agreement between Hasson and Lee compensated Hasson disproportionately to the services he was qualified to perform or actually rendered. For example, the record shows that Hasson dissuaded Lee from retaining family law attorney Donn Fullenweider on the grounds that Fullenweider's fee schedule was unreasonable. A copy of Fullenweider's proposed retention agreement is in the record and places this contention in context. Fullenweider is board certified in both family law and civil trial law, a Fellow of the American Academy of Matrimonial Lawyers, and a member of the American Board of Trial Advocates. Fullenweider's contract specifies that, to retain his services, Lee would be required to pay a $10,000 acceptance fee and a $15,000 deposit, against which costs and Fullenweider's fees of $500 per hour would be billed. At these rates, Fullenweider would have to work twenty-four hours per day, seven days per week, for more than three and one-half years to earn the $15.4 million Hasson claimed Lee is ultimately obligated to pay. We further note that if Hasson had been employed under the same terms he rejected as unreasonable when offered by Fullenweider, then the $4.22 million Hasson already has received would include overcompensation of approximately a million dollars, even if he had worked twenty-four hours per day every single day of his employment—yet this $4.22 million sum is nearly half a million dollars *less* than the compensation Hasson contends he anticipated at the time of the original agreement.

As Hasson's attorney stated in closing argument, "Now there is another truth that's inescapable. Man, that was a pretty rich deal. That was a pretty fat hog. That's a fair—that's a fair truth. . . ." We agree with counsel's apt characterization: it is an inescapable truth that the contract

---

duplicate those discussions here; however, because these issues are also factors in determining the fairness of the transaction, we incorporate those sections by reference in our discussion of fairness.

14. This figure is calculated by multiplying $75 million by 57% (the proportion of the estate allocated to Lee) and multiplying the resulting product by 11%. The rental of the Dunsinane House was to be deducted from this figure.

at issue is "a pretty fat hog." But rather than disclosing that his compensation far exceeded the value of the services he was qualified to render, Hasson gave Lee opinions on tax and legal matters predicated on an admitted misunderstanding of the law,[15] relied on advice from friends and acquaintances without regard to their qualifications and at additional cost to Lee,[16] and, at times, even dissuaded Lee from seeking independent advice from qualified professionals.[17]

Hasson argues that his compensation is fair because he increased the value of Lee's share of the marital estate by advising Lee to pressure Pai into exercising his Enron stock options and selling shares of Enron stock when its value was high. Lee agrees that she did ask Pai to sell the stock, and it is undisputed that Pai sold thousands of shares worth millions of dollars. But the fact that Pai sold the shares is subject to competing inferences. Although the jury might have inferred that Pai sold the shares in response to Lee's request that he do so, it is equally likely that Pai, an Enron executive with advanced degrees in economics and who all parties agree had made all previous financial decisions in his twenty-three year marriage, continued to make such decisions independently.[18] *See City of Keller,* 168 S.W.3d at 813 ("When the circumstances are equally consistent with either of two facts, neither fact may be inferred."). The possible inference that Pai acted indirectly on advice that Hasson rendered as part of his agreement with Lee is no more than speculation. For example, Hasson admits that he told Lee in August 1999—*before* any agreement between the parties—that the Pai marital estate held a disproportion-

ate share of its assets in Enron stock and needed to diversify. Lee agrees that, based on Hasson's advice, she asked Pai to sell some stock, and the record supports an inference that she made the request at the end of January 2000; however, Pai exercised options and sold stock over a period of many months, and the evidence does not indicate a pattern linking these actions to requests by Lee. Moreover, the options and shares were community property, and Lee's ownership interest in these marital assets was the same whether the assets were held in the form of unexercised stock options, shares, or cash. Hasson did not increase the value of these securities, and although Pai's timing in selling these assets prevented the community estate from diminishing in value when the price of Enron stock later plummeted, a reasonable jury could not find, by a preponderance of the evidence, that Pai's sales decisions are attributable to Hasson.

We also note there is no evidence that Hasson's services assisted Lee in obtaining a greater share of the marital estate than she would have received without his services. Ultimately, Lee received just over 57% of the marital estate, but the obligation to pay Hasson 10% or 11% of the estate, if enforced, would reduce her share to less than 50%. Thus, under the contract he describes, Hasson would benefit at Lee's expense, as he essentially admits:

Q: If it is true that she was going to receive 50 percent of the estate no matter what, if she has to pay $14 million to you, she will not end up with 50 percent of the estate, will she?

A: As it stands today, that's correct.

15. *See* section III(B)(5), *infra.*

16. *See* section III(B)(2), *infra.*

17. *See* section III(B)(1)(c), *infra.*

18. Pai testified that he sold the stock to convert the property to cash in order to facilitate the division of property in the divorce.

*See City of Keller,* 168 S.W.3d at 815 ("Undisputed contrary evidence may also become conclusive when a party admits it is true.").

There is also evidence in the record that Lee could have used the services of a divorce attorney and retained more than 50% of the marital estate even after payment of legal fees, but there is no evidence that Hasson told Lee that others could perform his services at a lower cost. Although Hasson testified that he did not know that others could perform his services at a lower cost, he also testified that the first task Lee asked him to perform was to devise a fair compensation scheme:

> Actually, Lanna had a brilliant idea and it helped me in coming up with—you know, I guess my first job was to come up with my compensation. Actually, that was—that's what she told me. She told me to *go figure out something that was fair,* okay, but there was something that Lanna wanted. She said, look, I want a deal whereby you are just as motivated to do well at what you are doing. Okay. As—in other words, she didn't want me to just be working to where I'm benefit[t]ing. She wanted me to work to where if I benefit[t]ed, and mainly if she benefit[t]ed then I would benefit proportionately. In other words, if what we did was good, it would be good for both of us. And so she wanted me to come up with an idea that basically—if—that *it had to be good for both of us.* That's the bottom line.

(emphasis added). Neither the January 18, 2000 agreement nor the May 3, 2000 modification satisfied Lee's requirements that the terms of the agreement be "fair" and "good for both [Lee and Hasson]," nor is there evidence in the record that Hasson took any steps to determine whether the compensation schemes he proposed or accepted were fair to Lee.

For these reasons, as well as those discussed below, a reasonable jury could not have concluded that the transactions were fair to Lee.

**(b) Did Hasson significantly benefit from the transactions as viewed in light of circumstances existing at the time of the transactions?**

When viewed in the light of circumstances existing at the time of the transaction, Hasson's significant benefit from the transaction was unquestionably his extraordinary compensation. Thus, we need not repeat our discussion of this factor, but incorporate that discussion by reference as set out in section III(B)(1)(a), *supra.*

**(c) Did Lee have the benefit of independent advice?**

Hasson does not dispute that there is no evidence in the record that Lee received the benefit of independent advice regarding her agreement with Hasson. Rather, Hasson testified at trial that Lee refused to obtain independent advice because she chose to keep their agreement secret:

> Q: By the way, Mr. Hasson, who did you take Ms. Lee to in order to have your contract with her determined to be fair and reasonable?
>
> A: I offered to have that document put in writing. And when she said she didn't want it in writing then I asked, well, why don't we talk to Faye, your sister, your confidant. She said she did not want anyone else to know.
>
> Q: So the answer is, no one. Correct?
>
> A: That would be no one.
>
> Q: You did not take her to any other financial planner, insurance person, real estate agent, lawyer, candlestick maker, anybody else to give her an opinion about whether the agreement that you say you reached

with her was fair and reasonable for her, did you, sir?

A: You're right. I honored her request.

But Hasson's offer to have the initial agreement reduced to writing is no evidence that he fulfilled his fiduciary duty; the issue actually tried was whether Hasson was due compensation under the modified contract, and he does not contend that he offered to have that modified agreement memorialized in writing. More importantly, Hasson testified that Lee did not want the agreement reduced to writing because she was concerned that a written contract would be discoverable in the divorce suit; however, Hasson failed to refer her to an attorney for legal advice on this issue or to advise Lee that her stated reason for avoiding a writing is invalid. See Tex.R. Civ. P. 192.3 ("In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party"). Accordingly, Lee's lack of independent advice is due in part to Hasson's failure to disclose these important facts.[19]

We further note that Hasson actively dissuaded Lee from seeking qualified independent advice on more than one occasion. For example, both Hasson and his wife admitted that, at times, Lee wanted to use the services of a divorce attorney, and Hasson persuaded her to continue to pursue a mediated divorce without a lawyer. Moreover, Hasson offered evidence that he advised Lee not to retain family law attorney Donn Fullenweider based on the size of the fee Fullenweider would purportedly charge, although Hasson admitted at trial that a divorce attorney would not charge Lee as much as Hasson charged.

Because the record contains no evidence that Lee received the benefit of independent advice, a reasonable jury could not have made this finding on the record before us.

### 2. Did Hasson Make Reasonable Use of Lee's Confidence?

Hasson frequently recommended that Lee obtain advice from those with whom Hasson himself had a relationship, regardless of the person's qualifications to render the advice sought. For example, Pai had purchased a ranch in Colorado, and Lee anticipated that the value of the ranch would be a point of contention in negotiating an equitable property division. Hasson was acquainted with Jim Barron, the real estate agent who had handled the purchase, and Hasson suggested that Lee obtain an opinion on the value of the ranch from Barron. Hasson did not review Barron's resume, and Barron is not a certified appraiser. On October 26, 1999, Barron wrote Lee that, in his opinion, the land was worth approximately $850 per acre. The following day, Barron again wrote to Lee, revising his earlier opinion. In his second letter, Barron stated that a lawsuit affecting the ranch "is pivotal in the value of [the ranch] in that it affects title." Barron opined that the ranch had increased in value by only $100 to $150 per acre from the time of purchase. Hasson did not have the ranch appraised and stated at trial that he had no idea whether the information on which Barron based his opinion was correct. Although Hasson argues that he strengthened Lee's bargaining position in

---

19. This failure also demonstrates (a) Hasson's absence of the utmost good faith, (b) his use of his position to benefit at Lee's expense, (c) his failure to make reasonable use of Lee's confidence and to place her interests before his own, and (d) an instance in which Hasson's self-interest conflicted with his obligations as a fiduciary.

the mediation by suggesting that she obtain Barron's opinion, the ranch was actually valued in the AID at its capitalized cost, and there is no evidence that Barron's opinion had any effect on that valuation. On this evidence, a reasonable jury could not conclude that Hasson's failure to have the property appraised was a reasonable use of the confidence placed in him.[20]

Hasson also recommended that Lee use the services of his own accountant and longtime associate, Raleigh Bailes, although Lee already was represented by accountant Victor Harris. Hasson and Lee did not inform Harris of their agreement, but according to the testimony of both Hasson and Bailes, Lee discussed the contract with the accountant hired by Hasson. There is no evidence in the record that Hasson recommended to Lee that the existence of their contract be disclosed to Harris, who is the only person identified in the record as attending and advising Lee at the divorce mediation. Hasson also referred Lee to his own former employer to obtain financial planning advice, but there is no evidence that Hasson disclosed to the financial planner that Lee was obligated to pay Hasson both a fixed and a continuing share of the marital estate or that he recommended that Lee make such disclosures.[21] As a result, neither the accountant representing Lee in property settlement negotiations nor the financial planner Hasson recommended considered Lee's largest contractual obligation in making financial recommendations to her. In sum, a fair-minded jury could not conclude, based on this evidence, that Hasson made a reasonable use of Lee's confidence in him.

Hasson also failed to respond appropriately to Lee's concerns. At a meeting with Hasson and Bailes on May 19, 2000, Lee expressed concerns about a temporary restraining order or "asset freeze." Hasson discussed what he described as the "shenanigans" of the judge presiding over the divorce and suggested the judge had "a history" of freezing marital assets in divorce cases. Although Hasson admitted at trial that he does not know the legal requirements to obtain a restraining order, he did not suggest that Lee contact an attorney who could address those concerns. Nevertheless, in the same meeting, Hasson arranged for a law firm to prepare documents establishing a family limited partnership in which B. Lanna, Inc. would be a partner. These documents listed Hasson as a 10% owner of B. Lanna, Inc., although there is no evidence in the record that, at the time these documents were requested or prepared, Lee agreed that Hasson would own 10% of the corporation. A fair-minded jury could not disregard this evidence that Hasson did not make reasonable use of the confidence Lee placed in him.[22]

### 3. Did Hasson Exercise the Utmost Good Faith and Most Scrupulous Honesty?

 There is further evidence that Hasson not only failed to make reasonable use of Lee's confidence and failed to disclose material facts but also failed to exercise the utmost good faith and scrupulous honesty. For example, although Hasson

---

**20.** This is also evidence that Hasson failed to exercise the utmost good faith.

**21.** In addition, this is evidence of the lack of independent advice.

**22.** This is also evidence of Hasson's failure to (a) exercise the utmost good faith and scrupulous honesty, (b) place Lee's interests before his own, (c) avoid placing himself in a position in which his self-interest might conflict with his fiduciary obligations, and (d) fully and fairly disclose all important information to Lee concerning the transactions.

correctly points out that he dealt with third parties such as bankers, accountants, real estate brokers, attorneys, and contractors on Lee's behalf, he did not uniformly conduct these dealings with the utmost good faith and scrupulous honesty required of him. To the contrary, he allowed accountant Bailes to bill B. Lanna, Inc. for work performed solely on Hasson's behalf.[23] Hasson also executed contracts, ostensibly on Lee's behalf, that exceeded the scope of his authority, and falsely represented that he was acting under a power of attorney from Lee. In one instance, Hasson admitted that after his contract with Lee was modified on May 3, 2000, the Dunsinane House no longer formed part of his compensation. Nevertheless, Hasson entered a contract on May 4, 2000 for the construction of a pool at the house. Moreover, he indicated on the signature line of the contract that he was acting under a power of attorney for Lee; however, there is no evidence in the record that Hasson had a power of attorney permitting such actions at that time.[24] There also is no evidence that Hasson disclosed to Lee his intent to execute contracts on her behalf regarding the Dunsinane House after the property no longer formed part of his compensation. *See Home Loan Corp. v. Tex. Am. Title Co.*, 191 S.W.3d 728, 731 (Tex. App.-Houston [14th Dist.] 2006, no. pet. h.) (sub. op. on reh'g) ("Ordinarily, a fiduciary duty of full disclosure requires disclosure of all material facts known to the fiduciary that might affect the rights of the person to whom the duty is owed."). On these undisputed facts, a reasonable and fair-minded jury could not have found that Hasson exercised the utmost good faith and most scrupulous honesty required of him as a fiduciary.

### 4. Did Hasson Place Lee's Interests Before His Own, Refrain from Using the Advantage of His Position to Benefit at Lee's Expense, and Refrain from Placing Himself in Any Position in which His Self–Interest Might Conflict with His Obligations as a Fiduciary?

#### (a) Did Hasson place Lee's interests before his own?

The record also establishes that Hasson participated in transactions in which he benefitted at Lee's expense and did so without regard to whether the transaction was beneficial to Lee. For example, Hasson helped Lee obtain a loan in October 1999, although Pai already had arranged a loan for Lee. But there is no evidence in the record that the terms of the loan arranged by Hasson were more beneficial to Lee than the loan arranged by Pai. To the contrary, the transaction arranged by Hasson included a $120,000 payment to a company Hasson controls, although there is no evidence in the record that the company rendered any service in exchange for the payment.[25] On this record, a reasonable jury could not conclude that Hasson placed Lee's interests before

---

**23.** *See* section III(B)(4)(b), *infra*, for descriptions of such transactions.

**24.** Although the record does contain a limited power of attorney, it was effective only during a single specified week in March 2000. That power of attorney did not authorize Hasson to represent Lee in this transaction, and it had expired by its own terms more than a month before this transaction. The jury was not free to disregard this evidence that Hasson failed to exercise the utmost good faith and the most scrupulous honesty. *See City of Keller*, 168 S.W.3d at 810–11 (noting that a reasonable jury cannot disregard contrary evidence if there is no favorable evidence or if the contrary evidence conclusively establishes the opposite of the fact the jury was asked to find).

**25.** *See also* section III(B)(1)(a), *supra*, and sections III(B)(4)(b) and (c), *infra*.

his own.[26]

### (b) Did Hasson refrain from using the advantage of his position to benefit at Lee's expense?

In addition to the issues of compensation previously discussed, the record contains further evidence that Hasson used his position to benefit at Lee's expense.[27] For example, during the course of his agreement with Lee, Hasson applied for additional life insurance on his own behalf. In connection with this application, Hasson was required to provide information regarding his net worth. Bailes provided the information, and, incorrectly assuming that Hasson was seeking "key man" insurance benefitting B. Lanna, Inc., Bailes billed the work to B. Lanna, Inc. Lee eventually paid the bill. Because work solely benefitting Hasson was billed to B. Lanna, Inc. and paid by Lee, Hasson directly benefitted at Lee's expense; however, there is no evidence that Hasson reimbursed Lee or the corporation or even disclosed these practices to Lee. *See City of Keller*, 168 S.W.3d at 810–11 (noting that reviewing courts do not disregard contrary evidence if there is no favorable evidence or conclusively establishes the opposite of the fact the jury was asked to find). Moreover, the evidence shows a pattern in which work requested by Hasson was billed to B. Lanna, Inc. and paid by Lee. In April of 2000, Hasson traveled with Lee to Hawaii, where Lee was interested in buying property. Hasson acted as a liaison between Lee and her banker, real estate attorney, real estate agent, and title company. Hasson also sought advice from Bailes about the tax consequences if Lee were to buy a house in Hawaii for $12 million and sell it to Hasson for $7 million. Bailes advised Hasson that Lee would not be able to deduct the loss as a legitimate business expense. Although Hasson requested this information, Bailes billed B. Lanna, Inc. for this work, and again, Lee eventually paid the bill.[28]

### (c) Did Hasson refrain from placing himself in any position in which his self-interest might conflict with his obligations as a fiduciary?

Hasson's own testimony illustrates that he placed his self-interest above his fiduciary duty to Lee:

> The situation you heard about [Lee's son B.P.] kind of created the—well, she was concerned about liability. *Right, wrong or indifferent,* there was a definite worry about now that she was getting money this—her son could—I mean, there were real—she gave me lots of reasons—gave me a lot of reasons why this was a concern to her, but the bottom line was she was afraid that she would get sued. And now she has some money or now she's going to have some money. . . . So in my business I knew a little bit—I had learned a little bit about limited partnerships and how clients use them as an asset–protection vehicle, so kind of from that thought *I said, you know what, what we could do is create a partnership, a 90/10 partnership.* You be the owner. You be the controller, still the boss, but our deal will be a 90/10 partnership. And I said, and we'll—and we can—as soon as you get your assets, as soon as your estate—you come into

---

**26.** *See also* section III(B)(1)(a)-(c), *supra*, and sections III(B)(4)(b), III(B)(4)(c), and III(B)(5), *infra*.

**27.** *See also* sections III(B)(1)(a) and III(B)(4)(a), *supra*, and section III(B)(4)(c), *infra*.

**28.** Bailes's bills were disputed and were the subject of a separate lawsuit that eventually settled.

possession of your estate we'll create that partnership and the paperwork, all the legal paperwork. I said, *but listen, that means I have to wait until the very end.* ... Anyway, the point is that I told her, now look, in order—*in order for you to have the absolute—and the absolute confidence that any advice that I give you is not biased then there has got to be something in here that takes care of me and makes me feel good about working this hard for you during this time period.*

(emphasis added). Hasson did not advise Lee that her concerns about liability for her adult son's actions could be "right, wrong, or indifferent," nor did he refer her to a professional able to address her concerns. Rather, he proposed a partnership with himself, in which he would acquire a 10% interest in Lee's property. The record contains no explanation regarding how Lee could be protected from liability or otherwise might benefit by giving Hasson a 10% partnership interest in her share of the marital estate. To the contrary, the record demonstrates that Hasson would benefit from the transaction at Lee's expense.

Hasson further testified:

And so I said, *look, the 90/10, that's fine, but that's down the road whenever that happens, that partnership. I said, so here's my idea.* Look, we just did—you just bought that $3,000,000.00 condominium.... I said, we can use that same concept to get a home that you would invest in that you would own. It will be—in fact, she even gave me—Dunsi-

nane was right close to where she and Lou used to live.... She didn't help pick the site.... But when we went over there, Lanna said, hey, this is a great spot. Absolutely. This is a good deal. And she saw the job being built being gorgeous.... She started getting the idea about Dunsinane to be like a headquarters. In fact, I think you heard Mr. Bailes talking about that because it was going to be like a Houston headquarters. Because Lanna's plan, in her heart, was in Hawaii where she had loved once and whatnot. So her heart was in Hawaii, and so she was planning on spending a lot of time .... back and forth, and therefore was going to be— this house was huge. No problem. Lanna was going to live with us as well in Dunsinane,[29] so that's why she liked the area. She liked the house, was going—was involved with it....

(emphasis added). Thus, in addition to proposing the partnership, Hasson also proposed that Lee build a house where the Hassons would live. As he continued his testimony, Hasson explained the purpose of the house:

Q: Well, let's get down to the nitty-gritty. Did y'all reach an agreement?

A: Oh, we—yes. Yes, but—and the point—now I remember. *The point was that this house with me and Terry living in it was going to be the remuneration, the benefit that I got no matter what. In other words, if this—if this thing went to trial and Terry and I were going to*

---

29. We note that Hasson had helped Lee obtain a loan less than ninety days before the conversation Hasson describes. Lee had used the loan to purchase a condominium and resided there at the time of this conversation. There is no evidence in the record that Hasson advised Lee to sell the condominium or that Lee proposed to do so. Construing this evidence in the light most favorable to the verdict, we interpret Hasson to mean that Lee indicated an intent to maintain multiple residences, dividing her time among residences in Hawaii, her recently purchased condominium in Houston, and the home she would build for the Hassons in Houston.

*have to live through this and—and wait—wait for any money to—you know, 'til the end of her divorce, the home was going to be our benefit* and it was going to be structured in the form of basically a rental payment at the value of 10 percent of the value of that house. And the house was about $2.6 million, so the rent I was going to owe Lanna was going to be $260,000.00 a year, 10 percent. Okay? *The benefit to me was going to be that Lanna was going to carry that and deduct it from the salary that I was going—that she was going to give me from B Lanna, Inc., the salary equal to 1 percent of the value of what she got in the end, see?* So if—let's say she got a hundred and forty million dollars. One percent of a hundred and forty million dollars would be $1,400,000.00. That was going to be—that would have been my salary.... *That's what I was going to get, and that way I was never going to be biased on whatever* .... So the 260, the rent, the 260 would come out of and be deducted from the 1.4 million that I was going to get as my salary from the partnership....

(emphasis added). Hasson did not disclose to Lee that, by granting Hasson a 10% interest in a partnership holding her entire share of the Pai marital estate, Lee was overcompensating Hasson for any services he was qualified to render. To the contrary, he proposed that Lee pay him *additional* compensation in the form of a salary, part of which was to be paid in the form of a deduction for rent, to give Lee "confidence that any advice [Hasson rendered] is not biased." However, as a fiduciary, Hasson had a preexisting obligation to refrain from transactions with Lee that

were biased. This, too, was not disclosed to Lee.

In proposing and accepting Lee's purchase and his own rental of the Dunsinane House as a part of his compensation, Hasson placed himself in a position in which his self-interest might conflict with his obligations as a fiduciary in other ways as well. This is illustrated by Hasson's testimony regarding Lee's proposed purchase of the multi-million dollar Foundation House in Hawaii for the purpose of leasing it to others. Her real estate broker, Glen Fujihara, testified that Hasson investigated whether the purchase would be beneficial to Lee:

> Q: Did you think that he [Hasson] was sincerely interested in understanding the positives and negatives about purchasing this property on Lanna's behalf?
>
> A: Yes.
>
> Q: Was he looking out for her interests?
>
> A: Yes.

However, as Hasson admitted, he did not believe the transaction could be profitable:

> Now Lanna—Lanna was—when this house [Foundation House] was bought, Lanna and [real estate broker] Glen Fujihara were thinking that this was going to be like a rent house.... I was addressing the business. I was concerned because when I kind of crunched some numbers *I didn't see any way in the world a $3.2 million house could make any money as a rent house,* and I went over that with him. And he is a very good friend of Lanna's and had convinced Lanna that this—that this rental program could or would actually make money. I didn't get that. Okay. So—but I—it was something Lanna wanted to do. And this is a good example, actually, on of [sic] her being the boss.

She wanted to do it. *She said, help me get this done. That's what I did.* (emphasis added). Despite Hasson's belief that the purchase was not beneficial to Lee, there is no evidence that Hasson discussed his reservations with her or otherwise advised her that it would be unprofitable to buy the house for the purpose of leasing it to others. Significantly, however, this is the same arrangement that Hasson himself had previously obtained with regard to the Dunsinane House, i.e., that Lee buy or build a multi-million dollar home for the purpose of renting it. As with the Foundation House in Hawaii, there is no evidence that Hasson advised Lee that this arrangement could be unprofitable for her.[30]

### 5. Did Hasson Fully and Fairly Disclose All Important Information to Lee Concerning the Transactions?

■ Although the record contains many examples of Hasson's failure to fully and fairly disclose important information to Lee, perhaps the earliest and most significant such failure relates to Hasson's failure to disclose his lack of qualifications to advise or assist Lee regarding the "best property division and settlement possible" as he agreed to do. Hasson is not an attorney, and there is no evidence he consulted an attorney in making his settlement recommendations. Hasson also testified that he consulted no learned treatises and conducted no legal research in advising Lee.[31] Hasson also is not a certified appraiser and did not consult a certified appraiser to evaluate property of disputed worth. Although Hasson did not represent himself to be an attorney or an appraiser, a fiduciary does not comply with his duty solely by refraining from affirmative misrepresentations such as the representation that the fiduciary is actually licensed or qualified to perform legal or appraisal tasks; rather, a fiduciary breaches his duty where he fails to fully disclose important facts. Here, the record demonstrates that Hasson did not advise Lee that he not only lacked the required

30. We review the evidence in light of the jury charge, in which the jury was required to find that Hasson "did not place himself in any position where his self-interest *might* conflict with his obligations as a fiduciary." (emphasis added). Thus, it is not significant to our analysis that Hasson's failure to disclose the potential unprofitability of these real estate transactions may have been motivated by reasons other than self-interest. We further note, however, that his failure to advise Lee that the transactions were likely to be unprofitable also demonstrated Hasson's (a) failure to make reasonable use of the confidence Lee placed in him, (b) failure to act in the utmost good faith and with the most scrupulous honesty, (c) failure to place Lee's interests before his own, (d) use of his position to gain a benefit for himself at Lee's expense, and (e) failure to fully and fairly disclose all important information to Lee about the transactions.

31. Because of our disposition of appellants' first issue, we do not reach the issue of whether the agreement was unconscionable because it compensated Hasson for the unauthorized practice of law and did so on a contingency fee basis. *See Hughes v. Fort Worth Nat'l Bank,* 164 S.W.2d 231, 234 (Tex.Civ.App.-Fort Worth 1942, writ ref'd) (finding that the plaintiff who was paid $6,000 to represent husband "in working out a settlement" of a marital estate worth more than $100,000 was engaged in the unauthorized practice of law, and stating, "It is not in accord with reasonableness to think that Mr. Myers agreed to pay plaintiff this large sum of money merely to act as a messenger, or to act in the modest capacity of a personal servant for a comparatively short time."). We note, however, that property settlements of marital estates require a diverse set of legal skills. Family law attorneys are commonly called upon not only to represent their clients in court and to advise them on divorce laws, but also to structure advantageous settlements in accordance with state and federal laws in related fields such as tax, property, estates, retirement, insurance, and even corporate or securities law.

licenses, but also lacked the skills necessary to accomplish the tasks he agreed to perform.[32]

 Another example of Hasson's failure to fully and fairly disclose important information to Lee concerns the formation of B. Lanna, Inc. Hasson testified that the company was created for unspecified tax reasons and to insulate Lee's assets from her adult son's judgment creditors, if any. But Hasson's suggestion that Lee form a limited liability company to protect her assets does not constitute evidence that Hasson complied with his fiduciary duty because he produced no evidence that forming such a company was either necessary or sufficient to protect Lee from liability. There is no evidence in the record that Hasson sought to determine whether Lee would face any legal liability for the actions of her adult son, or explained to her the limits of any such liability. Moreover, even assuming that Lee faced such liability, there is no evidence that Hasson's proposed solution was an appropriate or effective one. A corporate entity can be disregarded and its shareholders held liable if the corporation is the mere alter ego of its owner "[as] shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and *corporate and individual property have been kept separately,* the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the *corporation has been used for personal purposes.*" *Castleberry v. Branscum,* 721 S.W.2d 270, 272 (Tex. 1986) (emphasis added); *see also* TEX. BUS.

CORP. ACT ANN. art. 2.21(A)(2) (Vernon 2003) (permitting a shareholder to be held liable for matters relating to or arising from the contractual obligations of the corporation if the shareholder is the alter ego of the corporation and used the corporation for perpetrating fraud for the shareholder's benefit) (now recodified in sections 21.223–.226 of the Texas Business Organizations Code, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 427–28). It is undisputed that, as a signatory to bank accounts belonging to the corporation as well as Lee's own bank accounts, Hasson authorized funds to be transferred from Lee's personal account to the B. Lanna, Inc. account for the purpose of paying Hasson an amount allegedly owed only by Lee. By funneling payments for personal debts through the corporation, Hasson may have weakened the ability of B. Lanna, Inc. to shield Lee from liability. *See Castleberry,* 721 S.W.2d at 272. There is no evidence that Hasson disclosed the possible consequences of these actions to Lee.[33]

Although Hasson admits that he advised Lee on tax matters and on ways to insulate herself from liability, there is no evidence in the record that Hasson was qualified to do so or that he disclosed his lack of qualifications. Instead, as Hasson admitted at trial, he incorrectly advised Lee that funds she paid him to advise her on the marital property division were tax deductible:

Q: You have represented to my client [Lee] that any amounts of money paid to you, that you're suing for in

---

**32.** *See also Dominguez v. Brackey Enters., Inc.,* 756 S.W.2d 788, 792 (Tex.App.-El Paso 1988, writ denied) ("Assurances that something will be done when followed by a failure to do anything, or have it done, can constitute evidence that the initial representations are misrepresentations.").

**33.** This is also evidence of Hasson's failure to exercise the utmost good faith and most scrupulous honesty and to make reasonable use of the confidence placed in him.

this lawsuit, would be tax deductible. Correct?

A: I believe I did.

Q: You understand, of course, that expenses incurred associated with procuring a divorce are not tax deductible; do you not?

A: I do know that.

Q: And I take it by your answer that you know it now but you didn't know it then. Or did you know it then, too?

A: I think it came up in—in the meeting. But I don't remember when I had that knowledge.

. . .

Q: You understand that you're [sic] representation to Ms. Lee that she would be able to deduct any fees of any kind associated with getting a divorce from her income taxes, that was incorrect. You know that, don't you?

A: Yes. I do.

Q: If you know it's incorrect, why did you put it in the letter?

A: I think I made a mistake.

*See City of Keller,* 168 S.W.3d at 815 (noting that undisputed evidence contrary to the jury's finding may be conclusive when a party admits it is true). The record contains no evidence that Hasson disclosed this mistake to Lee.

On appeal, Hasson argues that the evidence is sufficient to support the jury's finding that he satisfied his fiduciary duty to Lee because Lee herself chose the terms of their May 3, 2000 modification to the agreement. This argument focuses solely on the language modifying the contract proposed by Lee on May 3, 2000 and implicitly rests on the assumption that the fairness of a transaction can be demonstrated by evidence that the principal

chose the terms by which property was promised or conveyed to a fiduciary. Appellees cite no authority for this proposition, although we note that this argument might have some validity where the property at issue is a unilateral gift to the fiduciary rather than compensation for services rendered or promised. *See Vogt v. Warnock,* 107 S.W.3d 778, 784–85 (Tex. App.-El Paso 2003, pet. denied) (holding that a competent transferor's voluntary gift to a fiduciary is fair as a matter of law). Here, however, we direct our concerns not to a unilateral act such as a gift but to the agreed exchange of performances. The majority of Hasson's services were rendered before May 3, 2000, under terms that he proposed and Lee accepted, and in determining the fairness of the agreement, we are not free to disregard his course of conduct if reasonable jurors could not. *See City of Keller,* 168 S.W.3d at 827 (stating standard of review). Specifically, the jury was required to consider those factors set forth in Jury Question 17 and determine not only whether the transaction was fair, but also whether Hasson made reasonable use of Lee's confidence, acted with the utmost good faith and scrupulous honesty toward her, placed Lee's interests above his own, abstained from using his position for personal benefit at Lee's expense, refrained from placing himself in a position in which his self-interest might conflict with his fiduciary obligations to her, and fully and fairly disclosed all important information to Lee concerning the transactions. On the record before us, the jury could not conclude that Hasson satisfied these requirements, either before or after May 3, 2000, without disregarding the contrary evidence that a reasonable and fair-minded jury was obliged to consider.

Hasson similarly argues that his offer to allow Lee to renegotiate the terms of their

agreement after the value of Enron stock increased in January 2000 constitutes evidence that he complied with his fiduciary duty. As further proof of his fulfillment of his duty, he relies on evidence that Lee proposed the terms of the May 2000 contract modification. But there is no evidence that in any of these conversations— whether proposing the original compensation scheme, offering to renegotiate the terms, or discussing Lee's proposed contract modification—Hasson fully and fairly disclosed the material facts Lee needed to consider in making those choices.

After reviewing the record in the light most favorable to the jury's finding, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we conclude that a reasonable jury could not have found that Hasson fully and fairly disclosed all important information concerning the transactions at issue to Lee.

## C. Hasson's Remaining Argument that He Complied with His Fiduciary Duty

In sum, Hasson argues he complied with his fiduciary duty because the evidence shows: (1) Lee chose the terms of the initial agreement from among the three compensation schemes he proposed, (2) he offered to have the initial agreement reduced to writing, (3) he offered to allow Lee to renegotiate the terms of the agreement after the value of Enron stock increased in January 2000, (4) Lee proposed the modification of the agreement, (5) Hasson suggested that Lee consult her sister about the agreement, (6) he urged Lee to establish a limited liability company to protect her assets, (7) he introduced Lee to bankers, accountants and attorneys, and dealt with third parties such as real estate brokers on her behalf, (8) the jury implicitly rejected Lee's evidence that others would charge approximately $50,000 for the services he rendered to Lee, and (9) the deal was fair at the time it was made.[34] We have addressed all but one of these arguments, leaving only Hasson's contention that the jury "implicitly" rejected Lee's evidence of the lower amount others would charge for the services Hasson rendered to her.

The logic of this argument is circular. Hasson argues that the jury could not have answered Question 17 affirmatively and found that Hasson complied with his fiduciary duty to Lee unless it found that the transaction was fair. He therefore reasons that since the jury found the transaction was fair, the jury also must have rejected Lee's evidence that Hasson's services were worth approximately $50,000. But the finding that Hasson complied with his fiduciary duty is the same finding that appellants challenge; thus, this argument begs the very question under review. Moreover, the presumption that the jury rejected the evidence that Hasson's services were worth $50,000 is not evidence that his services were worth millions, or that Hasson proved the other facts the jury was instructed to find.

## D. Harm Analysis

■ The evidence favorable to the challenged finding is legally insufficient, and the contrary evidence that a reasonable jury could not disregard is conclusive. On the record before us, we hold that a reasonable juror could not find that Hasson complied with his fiduciary duty to

**34.** Hasson also argues that he complied with his fiduciary duty to Lee by urging her to protect her children by getting her own life insurance policy. However, this transaction occurred in August 1999, before any agreement between Hasson and Lee, and therefore is not relevant to our inquiry.

Lee. Consequently, Hasson has failed to overcome the presumption that his contract with Lee is void. *See Chien,* 759 S.W.2d at 495 ("*All* transactions between the fiduciary and his principal are presumptively fraudulent and void. . . ."). Stated another way, Hasson failed to meet his burden at trial to prove that his contract with Lee is valid. *See id.* (stating that "the burden lies on the fiduciary to establish the validity of any particular transaction in which he is involved."). The trial court's judgment disregarding the existence of the confidential relationship between Lee and Hasson therefore constitutes reversible error.

## IV. Conclusion

Having reviewed the record under the applicable standard of review, we hold there is legally and factually sufficient evidence that Lee and Hasson had a preexisting relationship of trust and confidence, and there is legally insufficient evidence that (a) the transactions at issue were fair to Lee; (b) Hasson made a reasonable use of the confidence Lee placed in him; (c) Hasson acted with the utmost good faith and exercised the most scrupulous honesty toward Lee; (d) Hasson placed Lee's interests before his own, did not use the advantage of his position to gain any benefit for himself at Lee's expense, and did not place himself in a position in which his self-interest might conflict with his obligations as a fiduciary; and (e) fully and fairly disclosed all important information to Lee concerning the transactions. We therefore sustain appellants' first issue,[35] overrule appellees' cross-point, and re-

verse and render judgment that appellees take nothing.[36]

---

**35.** As a result of our disposition of appellants' first issue, we do not reach the remaining issues.

**36.** No claims by or against Lou Pai have been appealed. Additionally, the parties do not appeal the judgment denying Lee's conversion and fraud claims; thus, the previous receipt of $4.22 million by Hasson and his companies is not at issue.