**Algie Lee HATTON, Appellant,**

v.

**Brutha TURNER, et al., Appellees.**

No. 1457.

Court of Civil Appeals of Texas, Tyler.

Aug. 28, 1981.

Henry T. Skelton, Kugle, Douglas & Skelton, Athens, for appellant.

Kenneth R. Barron, Joe B. Beam, Tyler, for appellees.

SUMMERS, Chief Justice.

This appeal involves a controversy between ten brothers and sisters, or those claiming under them, over ownership of an undivided 108/160th interest in two tracts of land in Henderson County, Texas. One was a 67 acre tract [1] in the Lindsey Survey, and the other was a 123.89 acre tract in the Cavitt, Hamill and Lowery Surveys.

Appellant, Algie Lee Hatton, claims ownership of the 108/160th interest by virtue of a deed from his father, J. B. Hatton, dated December 2, 1955, and recorded in Volume 433, Page 104, Deed Records of Henderson County. Appellees, Charles E. Hatton, Freddie D. Hatton, A. C. Hatton, Fayrene Dobson, Gertie Poyner, Joe [Jo] Henrickson, Cleo Brand, Herbert J. Hatton and Roberta Hatton (being the eight brothers and sisters of appellant and wife of his deceased brother, Otto Hatton) claim an undivided ownership in the 108/160th interest in said two tracts, as heirs of J. B. Hatton and wife, Threcie Hatton, the deceased father and mother of appellant and eight of the appellees.

This suit was originally filed by appellant, Algie Lee Hatton, on February 21, 1979, as a partition action against the owners of the remaining 52/160th interest [2] in said two tracts. In this action appellant claimed full ownership of the 108/160th interest. Appellees intervened in the partition suit and asserted their claim that the 108/160th interest should be divided into ten equal parts, one part for each brother and sister and one part for the sister-in-law.

In addition to a general denial, appellees alleged in their plea of intervention (1) that J. B. Hatton executed the deed in question in order to qualify for old age assistance and that said conveyance should be set aside for failure of consideration; (2) that the deed was invalid as a conveyance of Threcie Hatton's interest since the property was a part of the homestead and was executed without the wife's joinder; and (3) in the alternative, that the property should be impressed with a constructive trust for the benefit of appellees as heirs of J. B. Hatton and wife, Threcie Hatton. In defense of appellees' claim, appellant pled the three, five, ten and four-year statutes of limitation, as well as laches.

Trial was had before the court without the intervention of a jury. The court concluded that a constructive trust existed in favor of the appellees and decreed that the undivided 108/160th interest in said two tracts of land be divided equally between the appellant and appellees, each one owning an undivided one tenth (1/10th) share in said interest. From this judgment, appellant has appealed.

We affirm.

The trial court made and filed extensive findings of fact and conclusions of law, and no additional findings and conclusions were requested. The record on appeal also includes a statement of facts, consisting of 212 pages of testimony and one exhibit, being a copy of the deed in question.

The trial court, in its findings of fact, in part, found the following in support of its judgment:

4. J. B. Hatton on December 2, 1955, executed a deed purporting to convey his interest in the subject land to Algie Lee Hatton, such deed being recorded in Volume 433, page 104, Deed Records of Henderson County, Texas.

5. At the time of the aforementioned conveyance on December 2, 1955, J. B. Hatton was married to Threcie Adaline Malone Hatton. J. B. Hatton and wife

1. By later survey determined to contain 81.07 acres.

2. This 52/160th interest owned by other parties is not involved in this appeal.

were the mother and father of the plaintiff, Algie Lee Hatton, and the Intervenors in the subject suit.

7. There was no consideration passed for the deed from J. B. Hatton to A. L. Hatton dated December 2, 1955.

8. The property described in the above-referenced deed was community property of J. B. Hatton and wife, Threcie Adaline Malone Hatton.

9. The father, J. B. Hatton, conveyed the subject property to the Plaintiff, Algie Lee Hatton, in order to qualify for old age assistance.

10. The deed dated December 2, 1955, remained in J. B. Hatton's possession, specifically his lockbox, until after his death in December, 1962.

11. J. B. Hatton continued to pay taxes on the subject property after December of 1955 until the time of his death.

12. J. B. Hatton was born in 1886.

13. Algie Lee Hatton, the Plaintiff, told several persons, including his brothers and sisters, the Intervenors, that he was holding the subject property for the benefit of the entire family and that he intended to divide the property equally among all the heirs of J. B. Hatton and wife, Threcie Adaline Malone Hatton.

14. Algie Lee Hatton continued stating to others that he was holding this property for the benefit of all the heirs of his father and mother as late as March 24, 1979.

15. J. B. Hatton and wife continued using, exercising dominion over and controlling the subject property until the death of J. B. Hatton, continuing claiming a portion of same as their homestead.

16. J. B. Hatton died intestate in December, 1962, in Henderson County, Texas; Threcie Adaline Malone Hatton died intestate in December, 1972, in Henderson County, Texas. Their heirs at law are the Plaintiff and Intervenors in the subject cause of action.

17. Neither J. B. Hatton, his wife, nor their heirs at law had any knowledge of any intention by Algie Lee Hatton, the Plaintiff, to repudiate his agreement with his father that he would hold the land for the benefit of the family until March of 1979. None of the heirs at law of J. B. Hatton and his wife had any knowledge, or any reason to suspect, that Algie Lee Hatton was holding the property adversely to their claim until March of 1979.

■ When specific findings of fact and conclusions of law are filed, no additional findings are requested, and a statement of facts is also brought forward, the findings will be sustained if there is any evidence to support them. *McWhorter v. City of Winnsboro,* 525 S.W.2d 701, 705 (Tex.Civ. App.—Tyler 1975, writ ref'd n.r.e.); *Mathews v. Warren,* 522 S.W.2d 569, 570 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.); See also 4 R. McDonald Texas Civil Practice § 16.10(b), p. 29 (1971).

Appellant predicated his appeal upon six points of error. In his first and third points he complains that the court erred in finding the property subject to a constructive trust and in failing to find that appellees' action on this basis was barred by the four year statute of limitations. Tex.Rev.Civ.Stat. Ann. art. 5529.

In his second point, appellant complains that the evidence is insufficient as a matter of law to support the court's finding that the father conveyed the property to appellant to qualify for old age assistance.

In his fourth point appellant asserts that the court erred in finding that the deed in question remained in J. B. Hatton's possession until after his death, because the testimony supporting such finding was violative of the Dead Man's Statute.

In his fifth and sixth points appellant contends that the evidence is insufficient as a matter of law to support the court's finding that the 67 acre tract was part of the parent's rural homestead and that the court erred in its ruling that the conveyance of this tract was void for lack of the wife's joinder.

■ We find no merit in appellant's fourth point of error. When appellees offered testimony from A. C. Hatton that he saw the deed in question in his father's deed

box, appellant objected on the grounds that such evidence constituted testimony as to a transaction with the decedent. We disagree. The court properly overruled this objection. Thereafter, A. C. Hatton testified in pertinent part as follows:

Q. Did you ever see that deed? A. A number of times.

    \*    \*    \*    \*    \*    \*

Q. Where did you see it? A. At home.

Q. And where is home? A. Opelika, Texas; Route 1.

Q. Is that where your father lived? A. Yes, sir.

Q. Is that where you lived? A. Yes, sir.

Q. Were you living at home during those years? A. Yes, sir.

Q. Were you living at home up until the time of your father's death? A. Yes, sir.

Q. Were you living there after his death? A. Yes, sir.

    \*    \*    \*    \*    \*    \*

Q. Now, you saw the deed where? A. In the deed box at home.

Q. Did you see the deed there after your father died? A. Yes, sir.

Q. How long after your father's death did you see the deed in this box? A. About a month.

Q. After that did you see it in the box? A. It disappeared.

Q. You don't know what happened to it? A. Yes, sir, I know.

Q. Well, of your own knowledge do you know what happened to it? A. Yes, sir.

Q. What happened to it? A. It went to Dallas.

Q. The deed did? A. Yes, sir.

Q. Who took it to Dallas? A. Lee.

Q. So Lee got the deed? A. Right.

Q. A month after your father died? A. Yes, sir; about two months.

Q. And took it with him? A. Right.

Q. Up until that time did Lee have the deed? A. No, sir.

Since the prohibition under Tex.Rev.Civ. Stat.Ann. art. 3716 (Vernon 1926) applies only to a "transaction with or statement by" the decedent, there is nothing to prevent a person from testifying as to his own acts if they do not form a part of some transaction with the decedent. 1 R. Ray, Texas Law of Evidence § 329, P. 337 (Texas Practice 3rd ed. 1980) and authorities there collected. It has been held that the rule of the Statute does not apply to facts and circumstances which though disclosing or affecting a transaction with a decedent, constitute no part of it. *Horst v. Tobin*, 18 S.W.2d 221, 224 (Tex.Civ.App.—El Paso 1929, writ refused). The testimony of A. C. Hatton that he observed the deed in question in his father's deed box did not violate the Statute. Although it disc'osed the existence of the deed, it did not form any part of the deed transaction.

We shall next address appellant's first and third points as we believe them to be dispositive of the case.

Several witnesses gave testimony regarding the purpose of the deed from J. B. Hatton to appellant. The witness, Lloyd Hatton, a nephew of J. B. Hatton, testified that sometime in the 1950's after the deed in question, J. B. Hatton told him he had deeded the land to Lee so that he might qualify for old age assistance. Lloyd Hatton did not know whether J. B. Hatton ever received old age assistance.

David Brand, the husband of one of appellees, testified:

Q. Did you go on the property with J. B. Hatton between the years 1955 and 1962? A. I believe that's right, yeah.

Q. Mr. Hatton died in 1962, did he not? A. Yes, sir.

Q. Prior to his death, the last six or seven years of his life did he continue using the land in any way? A. In the last five years?

Q. In the last five to eight years, yes, sir. A. Yes, sir. Yes, sir.

Q. How did he use it? A. Well, he pastured and I know he built fence over there and worked on it that way.

Q. Either himself or someone that he hired? A. Yes, sir.

Q. All right. Did you know when he deeded the property to Lee? A. Yes, sir.

Q. All right. Did he talk with you before deeding this to Lee about deeding it to you? A. Sure did.

Q. Did he offer to deed it to you? A. Yes.

Q. Why? A. Because he thought that I would put it back where it belonged, with the children. I told him no way, because I felt like he had kids and it needed to be amongst them.

Q. Did he mention anything about applying for any Old Age Assistance? A. Yes, sir.

Q. Did he list that as one of the reasons for deeding it? A. That's right.

Q. Was that one of the reasons for deeding it to you or to Lee or to anybody? A. That's right.

Q. Did you ever have an occasion to go with him to apply for Old Age Assistance? A. No.

Q. Did he ever talk to you about actually having applied for Old Age Assistance? A. I heard him discuss it, yes.

Q. And did he apply then? A. I believe that's right.

Q. Did he receive Old Age Assistance? A. No.

Walter Dobson, another son-in-law of J. B. Hatton, testified that J. B. Hatton discussed the property involved in this suit with him and asked him to be administrator of his estate; that he told Mr. Hatton he wouldn't be administrator "because there's ten children in the family and everyone of them would hate my guts if I did." Mr. Dobson further testified as follows:

Q. Did you know that he deeded it to Lee Hatton? A. After he did it, yes.

Q. After he did it? A. Yes.

Q. Did he indicate his reasons for deeding it to Lee Hatton? A. He felt that he was on the verge of death. He knew that he was going to die pretty soon, I'm sure that he knew, and he said, 'I have to do something.'

Q. Do something for what purpose? A. Well, so that everybody would get a fair shake. Everyone of his children get a fair deal.

Q. Well, now, did he deed it to Lee Hatton for that purpose? A. Yes, I think so.

Q. What was his idea, then? A. To be able to draw Old Age Pension.

Q. Was his reason for deeding it to draw Old Age Pension? A. No. If he had of, if that was the sole reason I don't believe he would have because there had to be someone to oversee it that he thought would be fair and square with the rest of the children.

Q. You feel that he had deeded it to Lee with the idea of cutting out the rest of the children? A. No, sir.

Q. Did you ever go on the land with J. B. Hatton after he deeded it to Lee? A. No, I haven't been on the property but three times and that was before he ever asked to deed it to me and be administrator. I was there and that was when he asked me. He said, 'I know you know where the property is. I know you know all about it. How would you be administrator? Would you be administrator for me? Would you take care of this land [sic].' That was when I refused him.

[Q] Did he say that he wanted the property to be passed to all of his children? A. Divided equally is what he told me.

The record further discloses that appellant Lee Hatton assured appellees many times that he was holding the property for the benefit of all of them. This is shown by the testimony of Charles Hatton, Jo Henrickson, Fayrene Dobson, Cleo Brand, A. C. Hatton and Leo W. Henrickson.

Charles Hatton testified that Lee Hatton talked to him about the property at various occasions from 1962 until the fall of 1975 or 1976; that Lee "said that he considered the property to be the property of the heirs and we didn't have anything to worry about, that he would convey it back to the heirs as it was supposed to be"; that he always contended he was holding it for the heirs and never said he was holding it only for himself; that Lee said he was aware that the reason his father deeded it to him was "to get the Old Age Pension"; that after his father died in 1962, Lee stated on many occasions that it would be best to keep the property as it was because, if he conveyed the property back at that time, his "mother would get rid of it"; and that was Lee's reason for holding on to the property after the death of his father.

Jo Henrickson testified that she talked to Lee about the deed on many occasions from 1955 through 1977; that he always said for us not to worry, that "Papa trusted him and he could be trusted," that we would get our property back when he found out how to do it, that he didn't know how to go about "turning the deed back like it should be on old undivided land"; that Lee said "any time I wanted my part all I had to do was get a deed made up and he would be glad to sign it," that Lee said he knew the property belonged to all of us, that for us to "be patient, and if we deeded it before Mama passed away she would have her share of it and that she would find her a buyer and sell it and then we would be messed up for sure"; that after their mother died and on up until their brother Otto's death in October 1977 (their last discussion) Lee continued to reiterate his position that he was holding the property for the benefit of the whole family; that she told Lee many times after her father's death in 1962 that he should divide the money he received from the property among the heirs.

Fayrene Dobson testified on August 29, 1977, that she and Lee had talked about the property in question; that Lee always said "Fayrene, you're going to get your part" and that he said this to her as recently as two or three months ago; that after her mother's death she started telling him "Lee, its time for us to divvy up, make it right with the kids"; that Lee's response was "I have to find a way, Fayrene. It's in such a mess over there. So many in it. I have to find a way"; that she told Lee she would help him and suggested "lets get a buyer and get it surveyed out and give the kids their part," and that Lee's response was "Well, I don't know how to do it."

Gertie Poyner testified that Lee has never told her that she did not have an interest in the property nor that he was claiming title under the deed from their father to the exclusion of her and her other sisters and brothers; that a few years after her father's death, he said "Gertie, lets get together and put down all ten names and each one of us will take it each year to pay all the taxes"; that she told him "That's the best idea I ever heard" but Lee never did anything to follow up on the suggestion; that even though Lee knew why her father executed the deed, he never offered the other heirs their share of the rents which he collected from the property.

Cleo Brand testified that she had conversations with Lee on several occasions regarding the ownership of subject property; that he always acknowledged that she and the other heirs owned an interest in the property; that every time he would say "I'm not going to beat a brother or sister out of anything. They're going to get their part"; that the last time they talked about the property was at the time of their brother's death in 1977 when Lee said "I'm going to give it back to them if they'll shut their mouths."

In his testimony, A. C. Hatton stated that Lee always said he would deed the property back when the time was right and that he wasn't holding it contrary to the interest of the other heirs. Leo W. Henrickson, the husband of Jo Henrickson testified substantially to the same effect and further verified that Lee had told his wife Jo "that if she would get a deed written up in her name he would sign it." Mr. Henrickson also stated Lee always added the statement

457

"that it would be absolutely useless to you. It's worthless. There's so many people involved in it and you wouldn't know where your part was and there's nothing you can do with it."

Appellant, Lee Hatton, testified that he was claiming title to subject property by virtue of the deed from his father, J. B. Hatton; that he had resided in Dallas, since 1946 and visited subject property in Henderson County on weekends; that he did not pay either his father or his mother any consideration for said deed. He testified as follows regarding the deed transaction and conversations after his father's death with appellees:

Q. Mr. Hatton, you heard the question. Now, what lead up to your daddy deeding you the land and giving it to you, sir? Start back over again. A. He tried about a month before I accepted it, see. He said, "I want you to have it." Well, after about a month I said, "Well, all right, draw the deed up." So he did .... he brought the deed in and he said, "here, son, I got you something I want to give you." Then he handed me the deed.

Q. What did you do with the deed? A. I carried it home with me.

Q. And it's been home with you ever since? A. Yes, sir.

Q. With exception of the time that Fayrene and Gertie had it? Yes, sir.

Q. Did he say anything to you at all about wanting to give it to you so he would get his Old Age Assistance? A. I never heard that.

Q. But I'm asking you, did he tell you that? A. No, sir.

Q. Did you ever hear him tell anybody that? A. No, sir.

Q. When is the first time you heard of it? A. When they started talking about it.

* * * * * *

Q. ... did your daddy tell you why he gave you the land? [A.] All he ever said is, "I want you to have it." And I would tell him that wasn't right, and he said, "Yep, I want you to have it."

Q. So finally he convinced you to take it? A. He convinced me to take it.

Q. When did he give you the deed; what year, if you remember, did he give you the deed in? A. 1955.

* * * * * *

Q. Now, when did your brothers and sisters start inquiring to you about the land? A. Right after my daddy's death.

Q. What did they say to you. A. Well, they would say, "You know that's part ours." I would say, "No, I got the deed." "Are you going to give us our part." *I never, you know, told them I would or I wouldn't.* (Emphasis added.)

Q. ... did you talk to all of them at one time or another or do you remember? A. Well, it was mostly just two or three at a time.

Q. Who did the most talking to you? A. Oh, Fayrene. Charles, he said it to me a lot of times. Cleo. I talked to Herman about it.

Q. Did you tell them at any time that it was your land, you weren't going to give them any of it? A. I sure have.

Q. Did you tell them that before your mother died? A. Yes, sir.

Q. Did you ever tell them that you were waiting until your mother died so you could split it up with them? A. No. sir.

Q. Did you ever tell them that if they would be patient you would leave them part of it? A. No, sir.

■ The trial court heard all the witnesses and concluded that the credible testimony amply supported the imposition by the court of a constructive trust upon subject property for the benefit of appellees as heirs of J. B. Hatton and wife, Threcie Hatton, and further that the action of appellees based on the constructive trust was brought within four years from the repudi-

ation of the trust by appellant and therefore not barred by limitation. We agree.

A constructive trust is not in reality a trust but is an equitable remedy against unjust enrichment. 76 Am.Jur.2d, Trusts § 222, p. 447 (1975). Generally, a constructive trust is a relationship with respect to property subjecting the person, by whom title to the property is held, to an equitable duty to convey to another on the ground that his acquisition *or retention* is wrongful, and that he would be unjustly enriched if he were permitted to retain the property. *Scherer v. Wahlstrom*, 318 S.W.2d 456, 459 (Tex.Civ.App.—Fort Worth 1958, writ ref'd; Restatement of Restitution, § 160, p. 640 (1937). It is not necessary to the establishment of a constructive trust that an express or conventional trust relationship shall exist between the parties, or that any promise shall have been made by the one for the benefit of the other, 89 C.J.S. Trusts, 139a, p. 1020 (1955).

An agreement or promise between the parties is not a prerequisite to imposition of a constructive trust. As Chief Justice Greenhill said, speaking for the Supreme Court in *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 405 (1960):

A constructive trust does not, like an express trust, arise because of a manifestation of intention to create it. It is imposed by law because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.

Constructive trusts are usable in situations involving actual or constructive fraud. *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158 (1943); *Thigpen v. Locke*, 363 S.W.2d 247, 250 (Tex.Sup.Ct.1962). Among the types of constructive fraud is breach of a confidential relationship, *Omohundro v. Matthews*, supra, 161 Tex. 367, 341 S.W.2d at 409; *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 261 (1951); *Mills v. Gray*, 147 Tex. 33, 210 S.W.2d 985, 988 (1948); *Miller v. Huebner*, 474 S.W.2d 587, 591 (Tex.Civ. App.—Houston (14th Dist.) 1971 writ ref'd n.r.e.).

Confidential relationships may arise not only from technical fiduciary relationships such as attorney-client, trustee-cestui que trust, partner and partner, etc., but may arise informally, from moral, social, domestic, or purely personal relationships. *Thigpen v. Locke*, supra at 253; *Holland v. Lesesne*, 350 S.W.2d 859, 862 (Tex.Civ.App. —San Antonio 1961, writ ref'd n.r.e.); *Keel v. Haggard*, 590 S.W.2d 939, 945 (Tex.Civ. App.—Waco 1979, no writ); See also 76 Am.Jur.2d, Trusts, § 228, p. 452 (1975).

The Supreme Court in *Fitz-Gerald v. Hull*, supra 150 Tex. 39, 237 S.W.2d at 261, quoting from 54 Am.Jur. § 225, stated the rule as follows:

'While a confidential on fiduciary relationship does not of itself give rise to the constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, *and the courts are careful not to limit the rule or the scope of its application by a narrow definition or fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one persons trusts and relies upon another, whether the relation is moral, social, domestic or merely personal one.*' Sec. 225, 54 Am. Jur., 'Trusts', p. 173. (Emphasis by Supreme Court.)

The record in this case amply evidences a confidential relationship. Among several factors which indicate a confidential relationship are kinship, advanced age and poor health, taken together with evidence of trust. Bogert, Trusts & Trustees, § 482 (rev. 2nd ed. 1978). The record here clearly shows the family kinship as parent-child and brother-sister and the status of the father's age and health. It is also clear as to the confidence and trust which the father confided in his son, Lee Hatton, and as to the confidence and reliance the appellees placed in their brother that he would fulfill

his assurances that he was holding the property in question for the benefit of the appellees as heirs to their parents' estate.

 The statute of limitation in a case involving a constructive trust does not begin to run until the beneficiary knew or should have known he had a cause of action. *Audretta v. West*, 415 S.W.2d 638 (Tex. 1967); *Kelley v. Kelley*, 575 S.W.2d 612, 618 (Tex.Civ.App.—San Antonio 1978, writ ref'd n.r.e.); *Gause v. Gause*, 430 S.W.2d 409, 414 (Tex.Civ.App.—Austin 1968, no writ).

 From 1955 until his death in 1962, J. B. Hatton continued his use of the property in question, rendering and paying taxes upon the same. After the death of J. B. Hatton, and again after the death of his mother in 1972, Lee Hatton kept the income which was received from the property without any accounting to appellees for such income or any expenditures made. This conduct on the part of appellant was not considered by appellees to be adverse to their respective interests because at all pertinent times appellant gave repeated assurances to appellees that he was holding the property for the benefit of all the heirs of his mother and father. As a result of these assurances by appellant, appellees were lulled into a sense of security that appellant was holding the property for all the heirs and in due time would divide the property equally with them. It was not until after Lee Hatton filed his suit for partition in February 1979 against the owners of the other 52/160th interest that it became obvious to appellees that Lee Hatton was claiming the full ownership of the 108/160th interest to the exclusion of appellees and that he did not intend to carry out his assurances that he would divide the property with them as heirs of their parents. Appellees plea in intervention was then timely filed on June 19, 1979.

Appellant's first and third points are overruled.

In light of our disposition of appellant's first, third and fourth points, we need not address the remaining points.

The judgment of the trial court is affirmed.