# NO. 12-14-00302-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CORRINE AUGUSTINE NICHOLS HILL SHEARER,* *APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW NO. 2* |
| *DAVID SHEARER, INDIVIDUALLY AND AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF JOHN WILLIAM SHEARER, III,* *APPELLEE* | § | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Corrine Augustine Nichols Hill Shearer appeals the trial court's judgment in favor of David Shearer, individually and as independent administrator of the estate of John William Shearer, III. Corrine raises two issues on appeal. We affirm.

## BACKGROUND

Corrine married David's father, John, in 1990, when David was a young adult. In February 2008, Corrine and John divorced, although they continued to cohabit.[1] John had long-standing health issues and on November 2, 2009, sought care at Overton Brooks VA Medical Center in Shreveport, Louisiana. Corrine accompanied John to the Shreveport VA where he was found to be seriously ill and admitted. Corrine told the Shreveport VA staff that she and John were divorced. Consequently, according to medical records, Corrine was informed that she

---

[1] Corrine claimed at trial that they continued to live as husband and wife after their divorce, and that she was John's common law wife. She stated at trial that they cohabited and that they represented themselves to others as husband and wife. However, she acknowledged in her deposition that they did not intend to live as husband and wife after their divorce. Nevertheless, David admitted that the divorce was primarily for financial reasons and they continued to act as a married couple "for the most part."

would not be able to make decisions on John's behalf. Corrine submitted John's general power of attorney, but according to the social worker, the document did not authorize Corrine to make medical decisions for John. John also had another child, Wendy, but she did not regularly maintain close contact with John and Corrine. Therefore, the social worker told Corrine that David had the authority to consent to medical procedures for John since he was John's closest available relative. The social worker called David and left him a voicemail informing him of his rights.

While at the Shreveport VA, John's condition continued to deteriorate and on November 5, 2009, he was transported by helicopter to Michael E. DeBakey VA Medical Center in Houston, Texas. Corrine traveled to the Houston VA in John's truck where, in contrast to her actions in Shreveport, she claimed she was John's wife. David and Corrine spoke with each other by telephone nearly every day after John's transfer to the Houston VA.[2] In Houston, Corrine consented to several surgical procedures, some of which were exploratory in nature and carried with them a significant risk of death. Corrine remained at the hospital during John's entire stay.

David traveled to the Houston VA to visit John on November 21, 2009, which was his only visit to the hospital. Although John was on a ventilator and under heavy sedation, he was able to open his eyes and squeeze David's hand, which led David to believe John was aware of his presence. During this visit, the treating physician discussed John's condition with David and Corrine, including the possibility of executing a "Do Not Resuscitate" (DNR) order. David recalled that he and Corrine decided the family would monitor John's condition and make a decision later as a family. David returned home.

David remembered speaking with Corrine on the phone the following day and being told that John's condition had slightly improved. David claimed that Corrine never told him in subsequent conversations that John's condition was any worse than he observed on November 21. However, John's condition was deteriorating. On December 7, 2009, Corrine spoke with John's treating physicians about possible end of life issues and determined that it might be time to consider a DNR. According to hospital records, Corrine informed the staff that she would consult with family members to make a decision. But she did not consult David.

---

[2] David's last direct conversation with John was before he was transported to Houston. Shortly after John arrived in Houston, an endotracheal tube was inserted in John's neck. Later, John was placed on a ventilator and sedated, which prevented John from communicating verbally with David.

Corrine nevertheless executed the DNR the following morning, and the hospital withdrew all life sustaining care. On December 9, 2009, John died. Corrine never informed David of her decisions, even though they spoke on the telephone during those days. David did not learn of his father's death until after he died. Corrine had John cremated, and she spread his ashes over his mother's grave. David believed that John wished to have his ashes spread from a battleship because he was in the Navy.

David believed Corrine made the correct decision concerning the DNR. However, he took issue with Corrine's nondisclosure of her decisions that deprived him of the chance to see his father prior to his death, and her decision to spread his ashes in a manner different from what he believed his father desired. Consequently, David filed suit against Corrine asserting, among other causes of action not relevant to this appeal, breach of fiduciary duty and intentional infliction of emotional distress.

After a jury trial, the jury found, in relevant part, that Corrine and David had an informal fiduciary relationship, Corrine breached her fiduciary duty, and Corrine intentionally inflicted emotional distress upon David.[3] The jury awarded David $35,000.00 for past mental anguish for Corrine's breach of fiduciary duty and $0.00 for future mental anguish. It also awarded David $1,500.00 for past mental anguish arising from Corrine's intentional infliction of emotional distress, and $0.00 for future mental anguish. Finally, the jury found that Corrine acted with malice in breaching her fiduciary duty, and awarded David $10,000.00 in exemplary damages. The parties filed various posttrial motions. After a hearing, the trial court granted David's motion, denied Corrine's motions, and signed a judgment in accordance with the jury's verdict. This appeal followed.

## LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE

In Corrine's first issue, she challenges the legal and factual sufficiency of the evidence to support the jury's finding that she owed David a fiduciary duty.

---

[3] At the close of evidence, the parties filed competing motions for directed verdict on various issues. The trial court granted Corrine's motion for directed verdict in part, concluding that there was no evidence to support David's conversion action, but denied her motion in all other respects. The trial court also denied David's motion for directed verdict.

## Standard of Review

An appellate court conducting a legal sufficiency review considers the evidence in the light most favorable to the verdict, indulging every inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). A party attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which it did not have the burden of proof at trial must show that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We also apply a legal sufficiency standard applicable to denial of a directed verdict based on a lack of evidence. *City of Keller*, 168 S.W.3d at 823.

The appellate court must credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 807. A "no evidence" challenge must be sustained when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by the rules of law and evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. The record contains more than a mere scintilla of evidence if reasonable minds could form differing conclusions about a vital fact's existence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). Conversely, the record is insufficient when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence. *Id.*

An appellate court reviews the factual sufficiency of the evidence supporting a finding by considering and weighing all the evidence in a neutral light. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The reviewing court will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* However, the reviewing court is not a fact finder, and it may not pass on the credibility of the witnesses or substitute its judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). In other words, we may not merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Lesikar v. Rappeport*, 33 S.W.3d 282, 296 (Tex. App.—Texarkana 2000, pet. denied).

**Applicable Law**

There are two types of fiduciary relationships in Texas: (1) a formal fiduciary relationship arising as a matter of law, such as between partners or an attorney and a client, and (2) an informal or confidential fiduciary relationship arising from a moral, social, domestic, or merely personal relationship where one person trusts in and relies upon another. *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as recognized in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212 (Tex. 2002). Informal fiduciary relationships are not created lightly. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). When the evidence is disputed, the existence of an informal confidential relationship is a question of fact. *Lee v. Hasson*, 286 S.W.3d 1, 14 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Fiduciary relationships juxtapose trust and dependence on one side with dominance and influence on the other. *See Tex. Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 508 (Tex. 1980). Whether a confidential relationship exists is "determined from the actualities of the relationship between the persons involved." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962). "The problem is one of equity[,]" and the circumstances giving rise to the confidential relationship "are not subject to hard and fast lines." *Tex. Bank & Trust Co.*, 595 S.W.2d at 508.

We consider a variety of factors to determine whether an informal fiduciary relationship exists. *See Gregan v. Kelly*, 355 S.W.3d 223, 228 (Tex. App.—Houston [1st Dist.] 2011, no pet.). A confidential fiduciary relationship may exist where influence has been acquired and abused or where confidence has been reposed and betrayed. *Crim Truck & Tractor*, 823 S.W.2d at 594. A confidential relationship "exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing confidence." *See Tex. Bank & Trust Co.*, 595 S.W.2d at 507; *see also Pope v. Darcey*, 667 S.W.2d 270, 275 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("A confidential relationship exists where one person has a special confidence in another to the extent that the parties do not deal with each other equally, either because of dominance on one side or weakness, dependence, or justifiable trust on the other.").

We also consider whether the plaintiff justifiably relied on the defendant for support, the plaintiff's physical and mental condition, and evidence of the plaintiff's trust. *See Lee*, 286

5

S.W.3d at 14–16; *Trostle v. Trostle*, 77 S.W.3d 908, 914–15 (Tex. App.—Amarillo 2002, no pet.); *Hatton v. Turner*, 622 S.W.2d 450, 458 (Tex. Civ. App.—Tyler 1981, no writ). However, subjective trust alone is not sufficient to establish a confidential relationship. *Thigpen*, 363 S.W.2d at 253. Rather, the trust must be justifiable. *See id.* There must be additional circumstances, or a relationship that induces the trusting party to relax the care and vigilance that he would ordinarily exercise for his own protection. *See R.R. St. & Co., Inc. v. Pilgrim Enters., Inc.*, 81 S.W.3d 276, 306 (Tex. App.—Houston [1st Dist.] 2001), *rev'd in part on other grounds*, 166 S.W.3d 232 (Tex. 2005) (discussed in unpublished portion of the opinion). In examining whether the plaintiff's trust is justified, we examine whether he actually relied on the other "for moral, financial, or personal support or guidance." *Trostle*, 77 S.W.3d at 915. We examine whether, because of a close or special relationship, the plaintiff "is in fact accustomed to being guided by the judgment or advice" of the other. *Gregan*, 355 S.W.3d at 228 (quoting *Thigpen*, 363 S.W.2d at 253).

Another factor is the length and depth of the parties' relationship, although a long personal relationship alone is insufficient to create a fiduciary relationship. *See Lee*, 286 S.W.3d at 15; *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). For example, a familial relationship, while considered a factor, does not by itself establish a fiduciary relationship. *Tex. Bank & Trust Co.*, 595 S.W.2d at 508. Confidential relationships may arise when the parties have dealt with each other in such a manner for a sufficient period of time that one party is justified in expecting the other to act in his best interest. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). There is no bright line temporal requirement to establish a confidential relationship, except that in circumstances involving a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. *See Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005).

## Waiver

David argues that Corrine did not preserve her sufficiency issues. This is because, his argument continues, the court's unobjected to jury charge, as submitted, requires only proof that David justifiably placed trust in Corrine, and not the other factors we examine in assessing the relationship. Moreover, David contends Corrine's brief does not address the necessary finding under the charge as given. We disagree.

The parties' proposed charges requested essentially identical language in substantially the same form as submitted by the court. The trial court charged the jury, in relevant part, as follows:

> Did a relationship of trust and confidence exist between DAVID SHEARER and CORRINE SHEARER at the time of the occurrence?
>
> A relationship of trust and confidence existed if DAVID SHEARER justifiably placed trust and confidence in CORRINE SHEARER to act in DAVID SHEARER's best interests. DAVID SHEARER's subjective trust and feelings alone do not justify transforming arms-length dealings into a relationship of trust and confidence.

This question and instruction mirrors the standard submission for the existence of an informal fiduciary relationship in the Texas Pattern Jury Charge. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment*, PJC 104.1 (2014). In her brief, not only did Corrine attempt to negate the finding required by the court's charge—that David must have justifiably placed trust and confidence in Corrine—but she attempted to negate all of the factors we examine in analyzing whether the parties had an informal fiduciary relationship.

Moreover, Corrine filed motions for directed verdict, judgment notwithstanding the verdict, and to disregard jury findings challenging the legal sufficiency of the evidence to support whether an informal fiduciary relationship existed between them. *See Cecil v. Smith*, 804 S.W.2d 509, 511 (Tex 1991) (holding that these motions preserve legal sufficiency challenges). She also filed a motion for new trial challenging the factual sufficiency of the evidence to support the relevant finding on the relevant grounds. *See In re C.E.M.*, 64 S.W.3d 425, 428 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (holding motion for new trial preserves factual sufficiency issue). We hold that Corrine preserved her legal and factual sufficiency issues. Therefore, we examine all relevant factors in determining whether Corrine owed David an informal fiduciary duty under the specific facts presented in this case. *See Power Reps, Inc. v. Cates*, No. 01-13-00856-CV, 2015 WL 4747215, at *11-12 (Tex. App.—Houston [1st Dist.] Aug. 11, 2015, no pet.) (mem. op.) (describing the considerations in assessing informal fiduciary relationships as factors, not elements that must all be satisfied in a particular case).

## Informal Fiduciary Relationship

Corrine first argues that the special relationship, if any, with David did not exist prior to and apart from the transaction at issue. As we have stated, there is no bright line temporal requirement to establish a confidential relationship, except that in circumstances involving a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. *Meyer,* 167 S.W.3d at 331. The facts in this case do not relate to a business transaction, and this factor is inapplicable.

A confidential relationship also can arise when the parties have dealt with each other in such a manner for a sufficient period of time that one party is justified in expecting the other to act in his best interest. *See Ins. Co. of N. Am.*, 981 S.W.2d at 674. What may suffice to create the relationship in one case may not in another case, because the problem is one of equity and there are no hard and fast lines. *See Tex. Bank & Trust Co.*, 595 S.W.2d at 508. Corrine argues that David's trust is purely subjective, he is unaccustomed to being guided by Corrine's judgment or advice, and he was not justified in believing that Corrine would act in his best interest.

Corrine was David's stepmother. She married John in 1990 when David was a young adult. David and John, and later Corrine, worked together for many years selling automobiles. In 2003, Corrine discovered that David used some of the company's assets for personal expenses. She called a family meeting to confront David on the matter, which created discord between them. John told Corrine that he authorized the transactions. Their business struggled due to the economy, and David left the company in 2005 to pursue other opportunities because of his financial obligations to his wife and children. Corrine was upset with David because he left the company when it was heavily in debt and it ultimately failed. She testified that "her heart has never been the same." Corrine also worked with David's wife, Angela, in the real estate business. Corrine developed relationship problems with Angela, resulting in Angela's departing the business. Corrine ceased attending Christmas parties at David and Angela's home after the 2003 meeting. There is certainly no evidence that Corrine and David shared a confidential relationship prior to John's illness.

Corrine learned at the Shreveport hospital that, due to her divorce from John, she had no authority to consent to his medical care. Contrary to what she told the Shreveport hospital staff, Corinne represented herself to the staff of the Houston hospital as being John's wife. Corrine

8

and David had near daily phone discussions concerning John's condition. During John's hospital stay, David contended with a number of personal issues. He had a shooting accident, resulting in the partial amputation of one of his fingers. He was an hourly employee and = missed over a week of work recovering from the incident. David's wife, Angela, was diagnosed with brain cancer during this time, making it difficult for her to work. David and Angela have four children, who at the time were from two to twelve years old. David's family depended on his continuing to work. Corrine knew that David had these personal issues.

David visited John at the Houston hospital on November 21, 2009. According to David, the treating physicians visited with him and Corrine concerning John's condition, and the possibility of executing a DNR order at some point. David also testified that they agreed to defer any decisions on that matter, hoping John's condition would improve, and that they would agree as a family. Corrine initially denied that the meeting occurred, but ultimately testified that she simply did not recall the meeting. David testified that after he returned home, Corrine told him that John's condition had improved, and that the DNR was "off the table." Corrine denied that this conversation occurred, and contends that the telephone records conclusively prove they did not have a discussion on the date David believed they discussed this matter. But even assuming that the telephone records show he was mistaken about the date, the jury could credit David's testimony that the conversation occurred.[4] The jury, as factfinder, was free to believe David, and we cannot substitute our judgment for that of the jury. *See City of Keller*, 168 S.W.3d at 819, 822; *see also Rubio v. Klein*, No. 11-13-00189-CV, 2015 WL 4720792, at *3 (Tex. App.—Eastland July 30, 2015, no pet.) (mem. op.).

As John's condition continued to deteriorate, hospital staff discussed possible end of life issues with Corrine. She told them that she would discuss the issue with her family. However, she never informed David, even though they briefly spoke that evening. The next morning, she executed the DNR order, and hospital staff ceased all care. John died the following day. David did not know the sequence of events preceding his father's death until he later read John's medical records.

Viewing the evidence in the light most favorable to the verdict, David and Corrine were not close prior to John's illness, but banded together during the family crisis. Corrine gained control by informing the hospital staff in Houston that she was John's wife. Corrine regularly

---

[4] Much of Corrine's testimony was argumentative.

communicated with David concerning his father's condition during the course of his illness. A rational jury could believe that she earned David's trust during this time. David and Corrine developed a pattern of communication in which Corrine gave David almost daily updates on John's condition. Corrine was aware of David's personal issues, including the shooting accident and Angela's cancer diagnosis. Corrine admitted that she knew David relied on her to relay updates on John's condition. Specifically, the following colloquy illustrates her knowledge and acceptance of his reliance.

> Q My question was, you knew David was trusting you to accurately provide the information about his father, yes or no?
>
> A Yes.
>
> Q And you also knew that if David's father's condition, John's condition, got to the point where death was going to happen for sure, he was trusting you to give him a call?
>
> A I don't know.
>
> . . . .
>
> Q You remember giving a deposition in this case?
>
> A Yes.
>
> . . . .
>
> Q [Reading from Corrine's deposition] Question. Did you believe David trusted that you would tell him if his father's condition got to a point where death was likely? Answer. Death was always likely, but, yes. Did I read that correctly?
>
> A Yes.
>
> Q So you knew that he was trusting you that if that point came --
>
> A Well, yes, sir. Everybody was trusting me. I had to tell them everything.

Then, Corrine admitted that at the critical moment, when she decided to execute the DNR and withdraw all life support, she did not disclose her decisions to David, even though she spoke with him on those days. A rational jury could infer that she failed to disclose this information because, according to her admission, she harbored feelings of angst against David after their family business failed.

Corrine relies on *Trostle v. Trostle* as support for her contention that her relationship with David does not give rise to a confidential relationship. *See Trostle*, 77 S.W.3d at 914. In

***Trostle***, a stepson filed suit against his stepmother in part for failing to inform him that he was not a party to a wrongful death suit based on the circumstances surrounding his father's death. ***Id.*** at 911. The trial court granted the stepmother's motion for summary judgment, holding that she and the stepson did not have an informal fiduciary relationship requiring her to act in his best interest. ***Id.*** The appellate court affirmed, holding that the stepson could not have relied on his stepmother for moral, financial, or personal support or guidance. ***Id.*** at 914. This was because they were not particularly close, the stepson's wife had personal issues with the stepmother, and they had not spoken to each other much prior to his father's death and not at all at the funeral. ***Id.*** Moreover, the evidence showed that the stepmother made no representations to the stepson concerning his status in the wrongful death suit. ***Id.***

The facts here are distinguishable. Although David and Corrine were not close prior to his father's illness, there is evidence that in the time of crisis, Corrine acquired David's trust, perpetuated it over the course of John's treatment, and then failed to inform David of her decisions at the critical time, thereby purposefully depriving him of the ability to see his dying father. Although David subjectively trusted Corrine, it did not stop there. Corrine admitted that she knew David relied on her to accurately report information concerning his father's condition. She also knew of all the personal difficulties David faced during his father's illness.

In summary, viewed in the light most favorable to the verdict, there were peculiar circumstances inducing David to relax the care and vigilance that he would ordinarily exercise for his own protection. *See **R.R. St. & Co.***, 81 S.W.3d at 306. Thus, the jury could rationally have concluded that Corrine acquired influence over David and abused it, and that David's confidence had been reposed and betrayed. *See **Crim Truck & Tractor***, 823 S.W.2d at 594; ***Young v. Fawcett***, 376 S.W.3d 209, 215 (Tex. App.—Beaumont 2012, no pet.). Moreover, a rational jury could have concluded that David was in a position of relative weakness and Corrine was in a position of dominance due to David's personal issues. *See **Tex. Bank & Trust Co.***, 595 S.W.2d at 507; ***Pope***, 667 S.W.2d at 275. Finally, the time period in question was not particularly long. But the law requires only that the parties have the relationship long enough for David to be justified in expecting Corrine to act in his best interest. *See **Ins. Co. of N. Am.***, 981 S.W.2d at 674. Because the issue is one of equity, under these unique facts, a reasonable jury could have concluded that the relationship developed sufficiently during the relevant time period to justify David's reliance on Corrine. ***Tex. Bank & Trust Co.***, 595 S.W.2d at 508.

We recognize that "[r]elatives assist people of advanced years or those who have health problems, and acts of kindness do not ordinarily give rise to fiduciary duties." ***Young***, 376 S.W.3d at 215. However, the jury found that a fiduciary relationship existed. Reasonable and fair-minded jurors may differ with an appellate court on that conclusion, but on this record of disputed facts, the "jurors must be allowed to do so." *See* ***City of Keller***, 168 S.W.3d at 822. "Jury trials are essential to our constitutionally provided method for resolving disputes when parties themselves are unable to do so." ***In re Columbia Med. Ctr. of Las Colinas***, 290 S.W.3d 204, 211 (Tex. 2009). Fair-minded jurors could reasonably conclude that a confidential relationship existed, and that the confidence was betrayed.

Finally, Corrine argues as part of her factual sufficiency challenge that David knew he had the ability to contact the doctors and obtain information concerning his father. It is true that other than his November 21, 2009 visit, David did not independently speak with the doctors concerning John's care. He testified that he did not even consider whether he would have to provide consent to the medical procedures, because he just thought the doctors and hospital staff were doing what was necessary to improve John's condition. A reasonable jury could infer that, under this unique record, David contended with personal issues during the relevant time, and that he did not take a more active role in John's care because Corrine stepped into that role to provide David with accurate information concerning his father's condition. Viewing the evidence in a neutral light, we cannot say the jury's findings are contrary to the overwhelming weight of the evidence and clearly wrong and unjust.

We hold the evidence is legally and factually sufficient to support the jury findings challenged on appeal. Corrine's first issue is overruled.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

In her second issue, Corrine challenges the award of damages for intentional infliction of emotional distress.

**Standard of Review and Applicable Law**

To recover for intentional infliction of emotional distress, a plaintiff must show that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. ***Hoffmann–LaRoche, Inc. v. Zeltwanger***, 144 S.W.3d

12

438, 445 (Tex. 2004). Intentional infliction of emotional distress is a "gap-filler" tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Id.* at 447. Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available, regardless of whether the plaintiff chooses to assert the alternative claim, the plaintiff succeeds on the alternative claim, or the claim is barred. *Id.* at 447-48. The tort of intentional infliction of emotional distress is available only in those situations in which severe emotional distress is the intended consequence or primary risk of the actor's conduct. ***Standard Fruit & Vegetable Co. v. Johnson***, 985 S.W.2d 62, 67 (Tex. 1998). Where emotional distress is solely derivative of or incidental to the intended or most likely consequence of the actor's conduct, recovery for such distress must be had, if at all, under some other tort doctrine. *Id.*

## Discussion

Corrine does not challenge whether her conduct was intentional, whether it was extreme and outrageous, or whether it caused David to suffer severe emotional distress. Rather, she contends that IIED should not serve as a "gap-filler" tort under these facts because another tort alleged by David could have compensated David for this harm. Specifically, Corrine argues that David's invasion of privacy claim for Corrine's alleged intrusion upon his seclusion in disposing of John's ashes without David's consent was an adequate theory of recovery to compensate him for his mental anguish. Consequently, her argument continues, the trial court should not have submitted his IIED claim to the jury.

Texas recognizes several forms of invasion of privacy, including intrusion upon a person's seclusion. ***Cain v. Hearst Corp.***, 878 S.W.2d 577, 578 (Tex. 1994); ***Blanche v. First Nationwide Mortg. Corp.***, 74 S.W.3d 444, 454 (Tex. App.—Dallas 2002, no pet). This type of invasion of privacy is generally associated with either a physical invasion of a person's property or eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying. ***Clayton v. Wisener***, 190 S.W.3d 685, 696 (Tex. App.—Tyler 2005, pet. denied). "The core of this claim is the offense of prying into the private domain of another, not publication of the results of such prying." ***Blanche***, 74 S.W.3d at 455.

Here, the basis for David's intrusion upon seclusion claim was Corrine's usurping David's right to make medical decisions on John's behalf and deciding to execute the DNR and

13

withdraw life support.[5]  For his IIED claim, David pleaded the same facts as his intrusion upon seclusion claim.  But he also pleaded another set of facts to support his IIED claim—Corrine's dispersion of his father's ashes in a manner inconsistent with his wishes caused David severe emotional distress.

Separately, David pleaded that Corrine's action in spreading his father's ashes supported a conversion theory.  At a pretrial hearing on Corrine's special exceptions, the parties understood that David contended that his IIED theory pertaining the disposition of his father's ashes was a "gap-filler" in the event that the trial court found that his conversion theory was invalid.  At the close of evidence, the trial court granted Corrine's motion for directed verdict on the conversion theory.  The trial court reasoned that Texas law recognizes that human remains are treated as quasi-property, and that the next of kin has a right to immediate possession of the remains for the purpose of directing the burial.  *See Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 384-85 (Tex. 2012).  The court also recognized that Texas law authorizes the recovery of mental anguish damages without physical injury for negligent mishandling of human remains or tissues, typically against morticians, funeral homes, and cemetery management companies.  *See id.*  However, neither the procedural vehicle nor the cause of action has been clearly delineated.  *See id.*

The trial court here held that the conversion action was not an appropriate means of redress because Texas law does not yet recognize a conversion claim for human remains.  Additionally, the court held that a conversion claim requires proof of the value of the property at the time of conversion, but there is no evidence proving the value of John's remains.  David does not challenge the disposition of his conversion claim in this appeal.  The trial court submitted the IIED claim to the jury over Corrine's objection.  Implicitly, the trial court concluded that IIED was an appropriate "gap-filler" tort.  David argued to the jury that his IIED claim related only to the emotional distress he suffered from the disposition of John's remains, not the ground he pleaded that mirrored the intrusion upon seclusion theory.

Corrine argues only that the intrusion upon seclusion claim would have been an appropriate tort to compensate David for his emotional distress related to the disposition of his father's ashes.  And we have stated that the core of intrusion upon seclusion is the offense of

---

[5] David had the authority to make medical decisions on John's behalf.  *See* TEX. HEALTH & SAFETY CODE ANN. § 166.039(b) (West Supp. 2015).

14

prying into the private domain of another. *See Blanche*, 74 S.W.3d at 455. Therefore, we hold that the intrusion upon seclusion tort is not an appropriate vehicle to compensate David under these facts. Moreover, the trial court held that David had no basis to support his conversion claim. Although the supreme court has authorized a common law right to recover mental anguish in mishandling human remains in certain circumstances, it has not clearly identified the appropriate cause of action in circumstances like these or its elements.[6] *See Evanston Ins. Co.*, 370 S.W.3d at 384-85. Consequently, IIED is an appropriate cause of action under the unique procedural posture and circumstances of this case.

Finally, Corrine argues that *Priebe v. A'Hearn* supports her argument. *See generally Priebe v. A'Hearn*, No. 01-09-00129-CV, 2011 WL 1330808 (Tex. App.—Houston [1st Dist.] Apr. 6, 2011, no pet.) (mem. op. on reh'g). In *Priebe*, a stepdaughter filed suit against her stepmother under an IIED theory for, among other things, failing to include her in the discussion concerning the treatment of her father's remains. *See id.* at *6. Importantly, the appellate court held that the stepmother, as the surviving spouse, had the right to control the disposition of the stepdaughter's father's remains, and consequently, she had no duty to inform her stepdaughter of her father's death or the disposition of his remains.[7] In contrast, David had a higher priority to dispose of John's remains than Corrine because she and John were divorced.[8] *See* TEX. HEALTH & SAFETY CODE ANN. § 711.002(a) (West Supp. 2015); *In re Estate of Woods*, 402 S.W.3d 845, 849 (Tex. App.—Tyler 2013, no pet.). Therefore, *Priebe* is distinguishable.

Corrine's second issue is overruled.

---

[6] David had the right to dispose of John's remains. *See* TEX. HEALTH & SAFETY CODE ANN. § 711.002(a) (West Supp. 2015). But Section 711.002 does not expressly authorize mental anguish damages when the decedent's remains are disposed of in a manner inconsistent with his desires. *See id.*

[7] The appellate court also held that the stepmother's conduct, although rude and unkind, was not extreme or outrageous as a matter of law. *See Priebe*, 2011 WL 1330808, at *7. However, Corrine does not rely on *Priebe* for that point, or otherwise argue in her brief that the evidence does not support the jury's finding that her conduct was extreme or outrageous.

[8] Section 711.002(a–1) sets out a procedure whereby a person's right to control the disposition of the decedent's remains terminates ten days after the decedent dies by virtue of a statutory presumption that the person is unable or unwilling to act. We note that this provision of the statute was added in 2011, approximately two years after John's death. Act of May 17, 2011, 82d Leg., R.S., ch. 532, §§ 2, 17, 2011 Tex. Gen. Laws 1311, 1318. Accordingly, the version of the statute in existence at the time of John's death did not contain a mechanism whereby David's right to control the disposition of his father's remains would terminate after the passage of the specified number of days.

## DISPOSITION

Having overruled Corrine's first and second issues, we *affirm* the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered May 27, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MAY 27, 2016**

**NO. 12-14-00302-CV**

**CORRINE AUGUSTINE NICHOLS HILL SHEARER,**
Appellant
V.
**DAVID SHEARER, INDIVIDUALLY AND AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF JOHN WILLIAM SHEARER, III,**
Appellee

Appeal from the County Court at Law No. 2

of Gregg County, Texas (Tr.Ct.No. 2011-1919-CCL2)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellant, **CORRINE AUGUSTINE NICHOLS HILL SHEARER,** for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*